FILED
COURT OF APPEALS
DIVISION II

2014 SEP 16 AM 10: 00

STATE OF WASHINGTON

BY_____
DEPUTY

## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In re Marriage of:<br><br>MARGARET BYERLEY,<br><br>                    Respondent,<br><br>v.<br><br>JAMES HOWARD CAIL,<br><br>                    Appellant. | No. 44250-7-II<br><br><br>PART PUBLISHED OPINION |

BJORGEN, A.C.J. — James H. Cail and Margaret Byerley separated and ultimately divorced four and a half years after they married. Their marriage followed ten years of unmarried cohabitation. Cail appeals from the dissolution decree and associated qualified domestic relations order (QDRO), arguing that the trial court abused its discretion by (1) characterizing the house in which Byerley and Cail resided as community property and calculating the final property distribution based on that characterization; (2) erroneously calculating the parties' community and separate interests in their pensions, resulting in an inequitable economic disparity; and (3) entering a QDRO that improperly increased Byerley's rights in one of Cail's pensions inconsistently with the dissolution decree. Because the trial court erred in characterizing the house as community property, and we cannot determine whether the trial court would have distributed the couple's property in the same way had it properly characterized the house, we reverse and remand. We reject the remainder of Cail's claims, and decline to award either party costs or attorney fees on appeal.

FACTS

Byerley and Cail met in April 1995 and dated for about five months before breaking up. Some time prior to July 1996, they resumed their romantic relationship. During this time, Cail was married to another woman, although he and his then-wife had separated and begun dissolution proceedings. The superior court entered the dissolution decree ending Cail's prior marriage on September 13, 1996.

Cail began searching for a house to buy in May or June 1996. Shortly thereafter, Cail and Byerley looked at the house at issue here together. The purchase and sale agreement, dated July 18, 1996, identifies the buyer as "James H. Cail and Assigns, Single." Ex. 7. Cail and Byerley apparently sought to obtain a title insurance policy, effective July 22, 1996, naming both as insureds. On or before July 26, 1996, Byerley signed a copy of the purchase and sale agreement as a buyer, but neither Cail nor the seller initialed or otherwise acknowledged the addition of her signature.

The seller executed a statutory warranty deed conveying the property to "James H. Cail, a single person" on September 9, 1996. Ex. 31. The title company recorded the deed in Cail's name alone four days later on September 13, the same day Cail's prior marriage officially dissolved.

Byerley and Cail began living together in the house in "October" or "the end of September" 1996, and set up a joint checking account from which they paid certain expenses related to the house. Clerk's Papers (CP) at 78; Verbatim Report of Proceedings (VRP) at 329-30. Although Byerley contributed labor and funds to the house, Cail refinanced the house multiple times during their relationship without consulting Byerley or including her name on any

2

documents. The parties never executed a writing expressing an intent to convert the house from Cail's separate property to community property.

The parties married on October 20, 2006 and separated on June 30, 2011. Byerley filed a petition for dissolution a few days later.

At trial, the parties presented very different accounts of their relationship. *Compare* VRP at 77 (Byerley testifies that "[i]t was a loving relationship. It was committed, intimate.") *with* VRP at 321 (Cail testifies that after 1998, "we always knew we were roommates. We were platonic, and it wasn't anything more."). Cail admitted that their relationship had started out as "boyfriend/girlfriend," but testified that it "disintegrated in no time," and did not involve sexual intimacy after 1998. VRP at 302, 319, 399. Cail maintained that financial considerations motivated his living arrangement with Byerley and that Byerley never had any part in the house purchase transaction. Cail claimed that they married only so that Byerley could take advantage of his generous union health insurance plan.

Byerley, in contrast, described their relationship as mutually loving, and testified that they were sexually intimate "[o]nce or twice a week" during the time they lived together until sometime in 2009. VRP at 75-76, 80, 91. She testified that they married out of love and to "set an example for [their] grand kids." VRP at 76. Byerley maintained that she and Cail attempted to buy the house together, but ultimately closed the deal in Cail's name alone because they could not obtain joint financing due to Byerley's poor credit history.

Various witnesses gave testimony tending to corroborate the version presented by the party calling the witness. Sharon Benson, identified as the "selling agent" on the purchase and sale agreement, testified that the inclusion of "and [a]ssigns" after Cail's name on the agreement

indicated the intent to add another buyer to the contract. Ex. 7; VRP at 39. Benson stated that she had "[n]o doubt, whatsoever" that the parties intended Byerley to be the second buyer. VRP at 65.

Byerley and Cail also presented different expert valuations of the community property shares of their pensions. Byerley's expert calculated the values of the community property portion of Cail's pension plans starting from October 31, 1996, the date Byerley's expert used as the date cohabitation commenced. Cail's expert, on the other hand, calculated the community share beginning with the date of Cail and Byerley's marriage, October 20, 2006, yielding a much smaller figure.

Although both parties worked and had similar incomes prior to Cail's retirement, Cail had a much longer work history and had contributed a larger share of his income to his pension funds than Byerley had to hers. The value of Cail's pensions thus amounted to more than $940,000, making up over 80 percent of the parties' total net assets. According to Byerley's expert, the community share of Cail's pensions totaled $370,404, of which $170,823 consisted of Cail's defined benefit union pension, converted to a present lump-sum value. Byerley had paid into her pensions only during the period of cohabitation, and her expert accordingly concluded that the entire value, approximately $55,000, was community in nature.

The trial court issued a letter opinion with its findings and conclusions and a table showing the court's property division. Although the trial court did not expressly make a credibility determination, the findings establish that the court credited Byerley's testimony and did not believe Cail's. The court concluded that Byerley and Cail had a committed intimate relationship "from September 1996 through the date of marriage," CP at 60, and based the

4

property division table on this conclusion, adopting Byerley's expert's pension values and placing the entire equity in the house, $61,825, in the "Community Share" column. CP at 62. The trial court characterized the house as "community-like" property based on its view that "a committed intimate relationship" existed throughout the parties' relationship and that therefore everything "acquired after 9/1996" was community in nature. CP at 60-61. Nevertheless, the trial court awarded the house to Cail.

Because the community interest in Cail's pensions comprised more than 70 percent of the total community property, in order to achieve an exactly equal distribution of the community assets, the trial court awarded Byerley the entire community share of Cail's union pension and ordered Cail to pay Byerley $23,113. The court did not divide Cail's other pensions or Byerley's pensions. The trial court did not award any asset characterized as one party's separate property to the other, leaving Cail with approximately $570,000 in separate property assets, more than the entire sum that the court had characterized as community in nature, approximately $529,000.

Cail objected to the proposed findings and conclusions and dissolution decree prepared by Byerley's counsel, and moved for reconsideration. Cail attached documents to the motion for reconsideration showing that the court's property division table had overvalued the equity in the house and the community shares of Cail's pensions. Cail also pointed out that the court's property division table overstated the remaining separate property portion of Cail's union pension by more than $500 per month.

The trial court refused to consider the materials Cail had submitted with his motion for reconsideration, and entered findings of fact and conclusions of law and a decree of dissolution consistent with the letter opinion. The trial court also entered a QDRO directing the

administrator of Cail's union pension to begin paying $1,166 of the monthly benefit, plus any associated adjustments, to Byerley. Cail timely appeals.

## ANALYSIS

After articulating the standard of review, we address Cail's claim that the trial court mischaracterized the house as community property. We then consider Cail's claim regarding the trial court's division of the interests in the parties' pension funds. Finally, we address the alleged discrepancy between the dissolution decree and the QDRO.

### I. STANDARD OF REVIEW AND GOVERNING LAW

We review a trial court's property division following dissolution of a marriage for manifest abuse of discretion. *In re Marriage of Urbana*, 147 Wn. App. 1, 9, 195 P.3d 959 (2008). A trial court falls short of this standard if it bases its decision on untenable grounds or acts for untenable reasons or if the decision is manifestly unreasonable. *Urbana*, 147 Wn. App. at 9-10. Where "substantial evidence" in the record does not support a finding from which a trial court draws a conclusion of law, the court has abused its discretion. *In re Marriage of Fahey*, 164 Wn. App. 42, 55-56, 262 P.3d 128 (2011), *review denied*, 173 Wn.2d 1019 (2012). Under this standard, evidence is "substantial" if it would persuade a rational, fair-minded person of the finding's truth. *Fahey*, 164 Wn. App. at 55. Although a trial court need not divide community property equally, the court also fails the manifest abuse of discretion standard if the property division creates a patent disparity in the parties' economic circumstances. *Urbana*, 147 Wn. App. at 10.

We apply the abuse-of-discretion standard to a trial court's distribution of property following a committed intimate relationship, formerly known as a "meretricious" relationship.

*Koher v. Morgan*, 93 Wn. App. 398, 401-02, 968 P.2d 920 (1998). Although Washington courts

characterizing property acquired during a committed intimate relationship do not apply

community property laws directly, we look to the statutory definitions of "separate" and

"community property" for guidance. *Connell v. Francisco*, 127 Wn.2d 339, 351, 898 P.2d 831

(1995). Unlike dissolution proceedings following a marriage, however, where the court may

award one party's separate property to the other to achieve a just and equitable distribution, a

trial court dealing with the termination of a committed intimate relationship may distribute only

property that would qualify as community property were the parties legally married, and the

court abuses its discretion by dividing property acquired prior to the relationship. *Connell*, 127

Wn.2d at 350.

Our Supreme Court has defined a committed intimate relationship as a "stable, marital-

like relationship where both parties cohabit with knowledge that a lawful marriage between them

does not exist." *Connell*, 127 Wn.2d at 346. The committed intimate relationship doctrine

serves to protect unmarried parties who acquire property during their relationships by preventing

the unjust enrichment of one at the expense of the other when the relationship ends. *See In re*

*Marriage of Pennington*, 142 Wn.2d 592, 602, 14 P.3d 764 (2000). In deciding whether the

parties had a committed intimate relationship, courts consider several nonexclusive factors, none

of which necessarily has more significance than another: (1) continuity of cohabitation; (2)

duration of the relationship; (3) purpose of the relationship; (4) pooling of resources and services

for joint projects; and (5) the intent of the parties. *Pennington*, 142 Wn.2d at 601-05. Courts

should not apply these factors in a hypertechnical fashion, but must base the determination on the

particular circumstances of each case. *Pennington*, 142 Wn.2d 602.

7

Whether the parties had a committed intimate relationship presents a mixed question of law and fact. *Pennington*, 142 Wn.2d at 603-03. Therefore, we defer to the trial court's unchallenged findings of fact, as well as challenged findings supported by substantial evidence in the record, but review de novo whether the trial court's legal conclusions properly follow from those findings. *Pennington*, 142 Wn.2d at 602-03. In this review, we neither weigh the evidence nor judge the credibility of the witnesses. *In re Marriage of Greene*, 97 Wn. App. 708, 714, 986 P.2d 144 (1999).

## II. THE TRIAL COURT'S CHARACTERIZATION OF THE HOUSE AS COMMUNITY PROPERTY

Although Cail does not challenge the trial court's determination that he and Byerley had a committed intimate relationship, he assigns error to the trial court's characterization of the house as community property, contending that substantial evidence in the record does not support the findings on which the court based that characterization. Cail contends that uncontroverted evidence at trial established that he purchased the house as his separate property prior to the inception of that relationship. Therefore, Cail argues, the trial court erred by including the house in the division of property. Cail argues in the alternative that the trial court should have at least credited him for money he used to make the down payment on the house because he earned it prior to meeting Byerley.

Byerley responds that the trial court properly characterized the house as community property because she and Cail intended from the outset to purchase the house jointly, and title vested after their committed intimate relationship began. Byerley argues in the alternative that, even if the trial court erred in characterizing the house as community property, we should affirm because the trial court had the authority to award one spouse's separate property to the other and

8

achieve an equitable overall distribution. Finally, Byerley contends that the trial court properly refused to include Cail's separate property contribution to the down payment because the parties disputed the amounts of their respective contributions to the down payment, and the payment was insignificant in light of the total value of the property subject to division. We agree with Cail that characterization of the house as community property was erroneous.

Byerley testified that she and Cail began cohabiting in "October" or "the end of September" 1996. CP at 78. Byerley also submitted expert valuations of certain property stating that cohabitation began October 31, 1996. Cail, on the other hand, denied at trial that the parties had a committed intimate relationship at all and contended that he bought the house in July 1996.

The seller executed a deed conveying the property to Cail alone on September 9, 1996, which deed was recorded on September 13. A conveyance of real property takes effect on delivery of the deed, and courts will presume delivery from the recording of the deed itself. 17 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 7.11, at 492-94 (2d ed. 2004). For purposes of characterization as community or separate property, however, "[t]he ownership of real property becomes fixed when the obligation becomes binding, that is, at the time of execution of the contract of purchase." *Beam v. Beam*, 18 Wn. App. 444, 453, 569 P.2d 719 (1977); *accord In re Binge's Estate*, 5 Wn.2d 446, 484, 105 P.2d 689 (1940). Thus, for purposes of its characterization, Cail acquired the property in July 1996, when the purchase and sale agreement was executed.

The character of property as separate or community "is determined at the date of acquisition." *In re Estate of Borghi*, 167 Wn. 2d 480, 484, 219 P.3d 932 (2009) (citing Harry M.

No. 44250-7-II

Cross, *The Community Property Law in Washington*, 61 WASH. L. REV. 13, 39 (1986)). More specifically,

> [u]nder the "inception of title" theory, property acquired subject to a real estate contract or mortgage is acquired when the obligation is undertaken. . . . Once the separate character of property is established, a presumption arises that it remained separate property in the absence of sufficient evidence to show an intent to transmute the property from separate to community property.
> . . . .
> Significantly, the evidence must show the intent of the spouse owning the separate property to change its character from separate to community property.

*Borghi*, 167 Wn. 2d at 484-85.[1] The record contains no evidence that Cail intended to change the character of the house from his separate property to community property. Thus, the initial separate character of the house remained intact.

In dividing property following a committed intimate relationship, a court may only treat as community in nature property that would qualify as community property were the parties legally married, and must therefore treat "property owned by one of the parties prior to the [committed intimate] relationship" as that party's separate property. *Connell*, 127 Wn.2d at 351. The leading practitioner's treatise on family law contains a discussion of the problems in determining exactly when a committed intimate relationship begins. 21 KENNETH W. WEBER, WASHINGTON PRACTICE: FAMILY AND COMMUNITY PROPERTY LAW § 57.8, at 338-40 (1997). Without purporting to resolve these intricacies, we hold that such a relationship cannot in any event commence prior to the date the parties begin living together. Precedent establishes cohabitation as a sine qua non of a committed intimate relationship: A committed intimate

---

[1] As noted, Byerley testified that she contributed labor and funds to the house. Such contributions may entitle the community to reimbursement for a portion of the increase in value of the house during the relationship, *In re Marriage of Elam*, 97 Wn.2d 811, 816-17, 650 P.2d 213 (1982), but do not change the character of the house itself as separate property, *In re Marriage of Pearson-Maines*, 70 Wn. App. 860, 865, 855 P.2d 1210 (1993).

relationship requires by definition that "*both parties cohabit* with knowledge that a lawful marriage between them does not exist." *Connell*, 127 Wn.2d at 346 (emphasis added).

Based on the undisputed evidence presented at trial, Byerley and Cail began cohabitating no earlier than the end of September 1996. Thus, Cail acquired the house before the committed intimate relationship began. Because substantial evidence in the record does not support a finding that the parties acquired the house during the committed intimate relationship, and because the record is devoid of any evidence that Cail intentionally transmuted its status from separate to community property, we hold that the trial court erred in treating the house as community property.[2]

Byerley's alternative argument is that because this case arose from dissolution of a legal marriage, the trial court also had the parties' separate property before it and had discretion to award one party's separate property to the other in order to achieve a just and equitable distribution. *See Holm v. Holm*, 27 Wn.2d 456, 463-64, 178 P.2d 725 (1947). Under this authority, Byerley argues that even had the trial court characterized the house as Cail's separate property, it could have made the same property distribution using its discretion to award a portion of Cail's separate property to Byerley when it dissolved the latter legal marriage portion

---

[2] Some other equitable doctrine, such as right of reimbursement, implied partnership, or constructive trust, may give Byerley a cognizable interest in the house. *See, e.g., In re Estate of Thornton*, 81 Wn.2d 72, 78-81, 499 P.2d 864 (1972); *Walberg v. Mattson*, 38 Wn.2d 808, 812-14, 232 P.2d 827 (1951); *Humphries v. Riveland*, 67 Wn.2d 376, 389-90, 407 P.2d 967 (1965). Cail admitted at trial that he "always said [he] would square up with [Byerley] on the house," and that, according to Cail's calculations, Byerley's "interest in the house" amounted to "almost 21 percent." VRP at 337-38. We hold only that the committed intimate relationship doctrine does not give Byerley any interest in the house because Cail acquired it in his name alone before such a relationship commenced.

of their relationship. This argument, however, founders on the rules governing when the mischaracterization of property requires remand.

As Byerley points out, a trial court's mischaracterization of property does not necessarily require reversal if the overall distribution remains just and equitable. We have held that a trial court's mischaracterization of property as community or separate requires remand only "where (1) the trial court's reasoning indicates that its division was significantly influenced by its characterization of the property, and (2) it is not clear that had the court properly characterized the property, it would have divided it in the same way." *In re Marriage of Shannon*, 55 Wn. App. 137, 142, 777 P.2d 8 (1989); *accord In re Marriage of Langham & Kolde*, 153 Wn.2d 553, 563 n.7, 106 P.3d 212 (2005).

Here, the trial court's reasoning makes clear that it intended to equally divide only the property it regarded as community in nature. Although the letter opinion states that "an equal division of the assets is equitable in this case," the trial court equally divided only those assets it characterized as community in nature, leaving the parties' separate property completely out of the calculations. CP at 61-62. The court did so even though this division resulted in Cail's receiving more than 75 percent of the parties' total net assets. Thus, the characterization of the property appears to have significantly influenced the trial court's division, and it remains unclear whether the court would have made the same division had it properly characterized the house as Cail's separate property.

The trial court's characterization of the house as community property rests on findings not supported by substantial evidence in the record and, therefore, amounts to an abuse of discretion. That characterization significantly influenced the division of property, and the trial

12

court's ruling fails to make clear whether it would have made the same division had it properly characterized the house. Under *Shannon*, 55 Wn. App. at 142, these circumstances require remand.

We reverse and remand for the trial court to make a just and equitable distribution after properly characterizing the house as Cail's separate property. Resolving the matter on this ground, we decline to consider Cail's other claim regarding the down payment.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

### III. DISTRIBUTION OF CAIL'S AND BYERLEY'S PENSIONS

Cail also contends that the trial court made mathematical errors regarding the parties' interests in their pension funds, which resulted in a property division not supported by substantial evidence. Byerley concedes that one error appears in the trial court's calculations, but maintains that the error did not affect the parties' rights, and argues that the court properly distributed the parties' interests in the pensions based on evidence to which Cail did not object. Byerley further responds that Cail bases the other alleged errors on evidence not submitted at trial, which evidence the trial court properly refused to consider when it heard Cail's motion for reconsideration. We agree with Byerley.

To determine the community share of a pension, courts generally divide the number of months during the marriage that the pension fund participant accumulated his or her entitlement to the pension benefits by the total number of months in which the participant accumulated such entitlement, then multiply that quotient by the total monthly benefit at retirement. *Greene*, 97

13

Wn. App. at 713. Byerley's expert calculated the community shares of Cail's pensions using precisely this formula, and the trial court adopted those valuations.

The mathematical error in the trial court's property division table concerns only the residual separate property portion of Cail's union pension. The total monthly benefit of $3,084, less the community portion of $1,166 awarded entirely to Byerley, leaves $1,918 per month to Cail. The trial court listed Cail's separate portion as $2,501 per month, apparently based on the assumption that the court had awarded only half of the community share to Byerley.

Because the court did not purport to divide the separate property, and divided the property characterized as community in nature exactly evenly, Byerley's contention that this error did not affect the parties' rights is correct. We reject Cail's argument concerning the mathematical error.[3] Should the trial court distribute the parties' property differently on remand, it may affect the propriety of the calculations regarding the pension fund. We leave it to the trial court to determine whether entry of a modified QDRO regarding the union pension, a transfer payment, or some other approach presents the most appropriate means to achieve a just and equitable distribution on remand.

---

[3] Cail also contends that the trial court made other mathematical errors, namely calculating the total present value of his union pension based on a monthly payment of $3,667.00 rather than the correct figure of $3,084.00, and calculating the community share based on the entire length of the relationship, 15 years, rather than the period prior to his retirement during which Cail paid into the pension fund, 12.75 years. Cail similarly contends that the court failed to apply the same formula to Byerley's pension funds. These claims have no basis in fact. The valuation submitted by Byerley's expert and adopted by the trial court plainly uses $3,083.83 as the total benefit amount and calculates the community share using 152 months, or 12.75 years, as the numerator. Byerley's expert applied the same formula to her pensions, making the entire value of both pensions community in nature. For these reasons, we also reject Cail's claims based on these alleged mathematical errors.

Cail also argues, based on materials submitted with his motion for reconsideration, that the standard formula employed by Byerley's expert yielded a community property share that included increases in value attributable solely to Cail's separate property share of the pension funds. The trial court, however, expressly refused to consider the reconsideration materials on which Cail based this claim.

The consideration of additional evidence submitted with a motion for reconsideration following a bench trial lies within the discretion of the trial court. *Chen v. State*, 86 Wn. App. 183, 192, 937 P.2d 612 (1997). Cail points to no compelling reason why he could not have obtained the material at issue prior to the trial. Furthermore, Cail's own expert based his valuations of the pensions on the same formula, obtaining a different result merely because he counted only those months that Cail paid into the pensions during the formal marriage and omitted the months Cail paid in during the earlier committed intimate relationship. The trial court properly refused to consider the materials on reconsideration, and Cail fails to show any abuse of discretion.[4] We reject Cail's argument concerning the characterization of the pensions.

Finally, Cail argues that the trial court erred in awarding Byerley the entire community share of his union pension and in failing to award him a share of Byerley's pensions. We find no basis in law for this argument. Trial courts have broad discretion in such matters, *In re Marriage of Larson*, 178 Wn. App. 133, 313 P.3d 1228 (2013), *review denied*, 180 Wn.2d 1011 (2014), and Cail points to no authority requiring courts to divide each community asset and liability. By awarding Byerley the entire community share of the union pension, but awarding Cail the

---

[4] This analysis also applies to the trial court's refusal to consider documents Cail submitted purporting to show that the court had overvalued the equity in the house. Of course, should the trial court wish to consider additional material on remand, it remains free to do so.

15

entirety of his other pensions and the house, the trial court achieved an equitable distribution that required only one QDRO, rather than a separate order for each pension. The trial court did not abuse its discretion, and Cail's argument fails.

## IV. THE QUALIFIED DOMESTIC RELATIONS ORDER (QDRO)

Cail next argues that the trial court abused its discretion in entering the QDRO by assigning a portion of his union pension to Byerley. The court erred, Cail argues, because it assigned more rights to Byerley than did the underlying dissolution decree, specifically by establishing Byerley as the irrevocable beneficiary of the pension's survivor benefit and awarding her any increases that may accrue to her share of the pension in the future. Byerley responds that not every provision in the QDRO need appear in the underlying decree, and that Cail has misread the QDRO, which actually assigns the survivor benefit to him. Again, we agree with Byerley.

Absent conditions justifying the reopening of the judgment, a trial court may not modify its own dissolution decree. *In re Marriage of Thompson*, 97 Wn. App. 873, 878, 988 P.2d 499 (1999). A court may, however, clarify an ambiguous decree. *Thompson*, 97 Wn. App. at 878. A subsequent order modifies a decree "when rights given to one party are extended beyond the scope originally intended, or reduced." *Thompson*, 97 Wn. App. at 878.

Byerley's contention that the QDRO actually assigns the survivor benefit to Cail is correct. The QDRO contains a handwritten notation specifying that "participant is entitled to 100% of survivor annuity." CP at 3. The QDRO identifies the "participant" as Cail. CP at 2. Cail's claim to the contrary has no basis in fact.

16

Cail's contention that the QDRO extends Byerley's rights beyond the scope provided by the decree rests on the fact that the decree awards Byerley only "$1,166 per month" from Cail's union pension, CP at 123, but the QDRO awards her "1,166, plus any increases or adjustments applied to this amount." CP at 3. With this conflict, the decree is ambiguous as to whether Byerley's award of the community share of Cail's union pension included any associated increases or adjustments: Thus, the QDRO qualifies as a clarification, not a modification of the decree.[5] The trial court did not abuse its discretion, and we reject Cail's claim.

## V. ATTORNEY FEES

Both parties request attorney fees on appeal. The dissolution statute gives the trial court discretion to award a party costs and attorney fees "after considering the financial resources of both parties," and provides that "[u]pon any appeal, the appellate court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorneys' fees in addition to statutory costs." RCW 26.09.140.

Although the decree leaves Byerley with substantially more income than Cail, at least so long as she continues at the same job and he remains in retirement, Cail has substantially greater assets. Accordingly, we decline to award attorney fees to either party. The trial court, of course, remains free to consider a fee award on remand.

---

[5] Regardless, the materials Cail submitted in support of his motion for reconsideration show that the union pension does not provide cost of living adjustments, and "no bonus or increase [is] planned at this time." CP at 80. Cail's attorney raised this issue during the hearing on the motion for reconsideration and acknowledged that no such adjustments apply to the pension. Thus, the difference appears immaterial.

No. 44250-7-II

CONCLUSION

Because the trial court erred in characterizing the house as community property, and we cannot determine whether the trial court would have distributed the couple's property in the same way had it properly characterized the house, we reverse and remand. We reject the remainder of Cail's claims, and decline to award either party costs or attorney fees on appeal.

Bjorgen, A.C.J.

BJORGEN, A.C.J.

We concur:

Hunt, J.

HUNT, J.

Lee, J.

LEE, J.

18