IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Marriage of: | ) | |
| | ) | No. 39546-4-III |
| ANDREW O. THEW, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | UNPUBLISHED OPINION |
| and | ) | |
| | ) | |
| WHITNEY MARY JACQUES, | ) | |
| | ) | |
| Respondent. | ) | |

FEARING, J. — In this marital dissolution appeal, we must decide whether a residence titled solely in the husband's name should be treated as community property. The husband purchased the home before the marriage but purchased the house for his then girlfriend and later wife to occupy with him, and the girlfriend and her daughters moved into the residence at the same time as the husband. The question on appeal requires examination of Washington's committed intimate relationship rule. Because the husband, then boyfriend, spent seven nights a week at the girlfriend's prior residence before the move, because the couple had already become pregnant, because the husband chose the house in part to please the girlfriend's daughter, because the couple intended the home to be a family home, because the parties agreed that the husband would pay the mortgage in exchange for the wife paying for food, utilities, and child expenses, because the husband failed to show the date of the home purchase or that he was the only one to

make the down payment, because the couple thereafter bore two children that resided in the home, and because the couple had a long-term relationship, we answer the question in the affirmative. We affirm the marital dissolution court's characterization of the residence as similar to community property and affirm the equal division of assets and debts.

FACTS

This divorcing couple is husband Andrew Thew and wife Whitney Jacques. Because they engaged in a monogamous girlfriend-boyfriend relationship before marriage, we refer to them as girlfriend and boyfriend during the period before the marriage and as husband and wife after the marriage. The appeal raises the sole issue of whether a home, on Driscoll Boulevard in Spokane, purchased before the marriage was the separate property of the husband or community-like property of both spouses based on the existence of a committed intimate relationship. The parties call the house the "Driscoll home." Title to the residence was listed only in the husband's name.

In short, the parties met in 2009 and began dating in 2013. Andrew Thew purchased the Driscoll home on some unspecified date in May 2015, and the couple moved into the abode on May 5, 2015. Thew and Whitney Jacques married in 2016 and separated in 2022. In trial testimony, the parties differed in the facts behind their intimate relationship, the purchase of the residence, their understandings about the nature of the home, and their financial arrangements.

In long, Andrew Thew and Whitney Jacques met through mutual friends in 2009. Thew works as a maintenance foreman for Spokane Parks and Recreation. Jacques operates a small organic farm in Vinegar Flats. Thew and Jacques started dating in June of 2013. At that time, Jacques was married to someone else, whom she divorced in 2014. She had two daughters from this previous marriage.

Whitney Jacques avowed at trial that a committed intimate relationship began when she and Andrew Thew began dating in June 2013. The couple had known one another for a while before dating and, according to Jacques, "jumped right into being in a committed relationship." Report of Proceeding (RP) at 66-67. Thew and she dated each other exclusively between June 2013 and their marriage in April 2016.

Whitney Jacques testified that she and Andrew Thew spoke about pregnancy and marriage before the purchase of the Driscoll home. Jacques did not wish to bear children with someone to whom she was not married. According to Jacques, she and Thew tried to get pregnant for three months until she became pregnant in 2014. She and Thew were excited about the pregnancy and told his family about it. Jacques miscarried in early 2015.

Andrew Thew averred that the couple's first pregnancy, which resulted in a miscarriage, was unplanned. Nevertheless, according to Thew, he and Whitney Jacques discussed getting married when she got pregnant.

3

The parties never shared a bank account, did not share expenses, and did not begin pooling resources or finances until they moved into the Driscoll home on May 5, 2015. Andrew Thew and Whitney Jacques had separate residences until they moved into the Driscoll home. According to Jacques, Thew spent every night at her previous apartment, however. She added that Thew, who then rented a house with a coworker, never spent time at the rented house. Thew testified he spent four to five nights per week at Jacques' residence beginning in 2013. Thew continued to receive his mail at the other address.

We do not know the specific date on which Andrew Thew purchased the Driscoll home. As far as this court knows, Thew did not introduce as an exhibit at trial the purchase documents. He also did not testify to the date of any earnest money agreement, closing of the transaction, or delivery of the deed. Also, as far as we know, Thew did not introduce as an exhibit any financial records that confirmed the purchase. Thew testified that only he searched for a home and that Whitney Jacques accompanied him to view the Driscoll home only after he paid earnest money.

According to Whitney Jacques, she and Andrew Thew shared the down payment, with her contributing $1,000 and Thew contributing $4,000. She presented no documentation supporting her contribution. Thew testified that he did not ask Jacques to contribute to the purchase of the Driscoll home. Thew did not recall Jacques making a $1,000 contribution to the down payment.

Whitney Jacques believed, when they looked for a home, that Andrew Thew intended for the home to be their joint property. Jacques avowed:

> He [Thew] talked about having room for all of us. He wanted to have a yard for the girls, my [Jacques'] daughters that we already had and future children. He wanted, you know, to make a master bedroom in the basement and so we could have our kids upstairs. He was excited for the girls to have their own room. He was excited that there was purple roses on the linoleum in the kitchen because at the time my 17-year-old daughter loved purple and she loved roses and he thought she would be really excited about it.

RP at 70-71. According to Jacques, Thew spoke of the home as "their" home to friends and family.

Andrew Thew insisted, during trial, that the Driscoll residence remained his sole property during the parties' entire relationship. Yet, on cross-examination, when asked about photographs taken on the day he moved into the home, which photos showed Whitney Jacques and her two daughters, Thew testified:

> It was our home together. It was my house.

RP at 120. Perhaps Thew meant that the physical structure remained his possession, while the abode's ambiance, the home's domesticity, the intimate moments transpiring in the residence, and the joy of family living became that of the entire family.

Andrew Thew solely paid the mortgage. Both parties testified, however, to an agreement under which Thew paid the mortgage, while Whitney Jacques paid for food,

utilities, and child-related expenses. The parties never shared bank accounts. According to Thew, after the purchase of the home, Jacques asked him to place her name on the title.

Andrew Thew and Whitney Jacques married on April 7, 2016. When the couple wed, Jacques requested Home Depot gift cards from friends and family so that she and Thew could perform improvements to the Driscoll home. Jacques' mother gave a wedding gift of a new front window for the residence.

Andrew Thew and Whitney Jacques bore two children together. Their first child was born on November 1, 2016. Thew testified to a common belief reached by one of the marriage partners that, after the birth of children, living conditions changed and he did not feel like the home was his space anymore. He testified, "It was hers, and I didn't feel welcome in my own home." RP at 92. Jacques and Thew resided together in the Driscoll home for six-and-a-half years before Jacques vacated the home on January 1, 2022.

PROCEDURE

Andrew Thew filed for marital dissolution in December 2021. The dissolution court entered an agreed parenting plan in August 2022. The case proceeded to trial in November 2022 with only the division of assets and liabilities at issue.

After trial, the dissolution court adjudged the Driscoll home to be a community asset valued at $330,000. The court added that the mortgage on the Driscoll home, valued at $124,970, was community debt. The court divided all community property and

6

debt equally between the parties. The dissolution court awarded Andrew Thew the Driscoll home and ordered him to pay Whitney Jacques an equalization payment.

The dissolution court entered, in part, the following findings of fact:

8. Real Property

The spouses' real property is listed below:
. . . Driscoll Blvd. [characterized as community property]
Conclusion: The division of real property described in the final order is fair
. . . .

11. Community Debt

The spouses' community debt is listed below:
Guild Mortgage of $124,970
Conclusion: The division of community debt described in the final order is fair.
. . . .

22. Other findings or conclusions

At trial, the Respondent asserted that the parties were in a Committed Intimate Relationship (CIR) prior to their marriage. The Petitioner denied that a CIR existed prior to marriage. The Court has analyzed the five *Connelly* [sic] factors to determine if CIR existed prior to the parties' marriage.
Factor One - Cohabitation: The parties started dating in 2013. At that time, Ms. Jacques was legally married to another individual but separated. Her divorce from her husband was finalized in spring 2014. Until the Driscoll property was purchased in May of 2015, the parties each had their own residence. Although Mr. Thew frequently stay [sic] at Ms. Jacques' home on Broadway, he did not consider that to be his home, he did not receive any mail there, and the Broadway address was not listed on his driver's license. Consequently, the parties did not cohabitate together until after they moved into the Driscoll home in May 2015.

7

Factor Two - Duration of Relationship: The parties' relationship started prior to their marriage and lasted until the end of 2021 or beginning of 2022 when this dissolution action was filed. Consequently, the parties' relationship continued for eight and a half years.

Factor Three - Intent of the Parties: The parties intended to be in a long-term relationship and continued with the long-term relationship when the Driscoll house was purchased in May 2015. The parties moved into the house as a family and continued to have two children. The parties eventually married. There was a mutual agreement of the parties to form that type of a relationship, living together, resources, to build a family, and eventually end up married, things of that nature support the intent of the parties to be in that kind of a relationship.

Factor Four - Pooling of Resources: Once the parties moved into the Driscoll home, Mr. Thew paid the mortgage while Ms. Jacques paid the utilities, food, and expenses that came up for the kids. Sharing of these expenses continued until Ms. Jacques vacated the Driscoll home in January 2022. The parties also invested their time and resources into the Driscoll home.

Factor Five - Purpose of Relationship: Based on the totality of testimony heard and the evidence admitted at trial, the purpose of the relationship, particularly based on the fact that the parties eventually married and have two children, was to have companionship, friendship, love, mutual support, caring, and building a family together. That purpose began prior to the parties getting married.

Based on the analysis of the foregoing factors, the parties were in a CIR prior to their marriage and prior to the purchase of the Driscoll house. Because the Driscoll home was purchased during the existence of a CIR, it is presumed community. A party alleging separate [sic] nature of an asset otherwise presumed to be community must provide clear, cogent, and convincing evidence to support such an assertion. Mr. Thew's testimony with regards to the down payment of $4,000 being separate in nature is self-serving and does not meet the burden. As such, the entire Driscoll home is community in nature.

Clerk's Papers (CP) at 69-72 (boldface omitted). Although the trial court acknowledged

the purchase of the home as occurring in May 2015, the court entered no finding of fact

as to the actual date of the purchase of the Driscoll home or as to whether Whitney

Jacques contributed to the down payment on the home.

LAW AND ANALYSIS

On appeal, Andrew Thew argues that no committed intimate relationship may

exist before the date the parties begin to cohabitate. In turn, he contends that the

dissolution court could not have declared the Driscoll home to be community property

because, as a matter of law, no committed intimate relationship existed at the time he

purchased the home. He highlights that the dissolution court did not find that the parties

cohabitated until moving to the Driscoll home. He contends that the dissolution court's

division of property was unfair, but solely on the basis of the mischaracterization of the

Driscoll home. In the course of his attack on the dissolution court's decision, Thew

contends that findings of fact 8, 11, and portions of 22 lacked a basis in the evidence.

Whitney Jacques argues that the couple entered a committed intimate relationship

when they began dating in 2013, two years before the purchase of the home. According

to Jacques, because Andrew Thew purchased the Driscoll home during the intimate

relationship, the dissolution court properly treated the residence as community property.

Jacques further argues that, assuming the dissolution court erred in finding that a

committed intimate relationship changed the status of the Driscoll home from Thew's

separate property to community property, the court still could have awarded her, during

the marital dissolution, an interest in the home or an equalization payment.

RCW 26.09.080 allows the court to award one spouse the separate property of the other spouse as part of an equitable division of property. Because we rule that the dissolution court did not err, we do not address this last argument from Jacques.

Findings of Fact

Before analyzing the law of a committed intimate relationship, we isolate the findings of fact challenged by Andrew Thew to determine if evidence supports the findings. Thew challenges findings of fact 8 and 11, and portions of 22.

In finding of fact 8, the trial court found the Driscoll home to be the community property of the parties and its equal division of the property to be fair. In finding of fact 11, the trial court found the mortgage on the home to be a community liability. Finding of fact 11 follows from finding of fact 8. Both findings of fact 8 and 11 are mixed findings of fact and conclusions of law. We reserve an examination of whether substantial evidence supports the findings when analyzing the law of a committed intimate relationship.

Finding of fact 22 comprises a lengthy recital of facts relevant to the determination of whether the parties entered a committed intimate relationship and whether the Driscoll home should be classified as community property. Andrew Thew challenges six discrete findings within the paragraph that conclude that (1) the parties entered a committed intimate relationship before May of 2015, (2) the parties' committed intimate relationship lasted eight years, (3) the parties intended a long-term marital and family relationship that

10

included raising children together, (4) the couple shared expenses and pooled resources with Thew paying the mortgage and Whitney Jacques paying food, utilities, and child expenses, (5) the parties intended a lengthy relationship that included love, companionship, support, and building a family even before the marriage, and (6) the Driscoll home was purchased during a committed intimate relationship. We review the evidence behind each finding.

We defer to the trial court's challenged findings of fact when supported by substantial evidence. *Muridan v. Redl*, 3 Wn. App. 2d 44, 54, 413 P.3d 1072 (2018). Substantial evidence exists if the record contains evidence of a sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise. *In re Marriage of Fahey*, 164 Wn. App. 42, 55, 262 P.3d 128 (2011). The existence of a committed intimate relationship, or the date it begins, is a legal conclusion, which this court reviews de novo. *Morgan v. Briney*, 200 Wn. App. 380, 389, 403 P.3d 86 (2017).

We note that the dissolution court's findings of fact echo the testimony of Whitney Jacques, not Andrew Thew. Still, the court made no express finding of credibility. In *Byerley v. Cail*, 183 Wn. App. 677, 334 P.3d 108 (2014), this court accepted the testimony of the girlfriend as a verity because, although the trial court did not expressly make a credibility determination, the findings established that the court credited Margaret Byerley's testimony and did not believe James Cail's testimony. We do similarly with Jacques' testimony.

11

The trial court found that Andrew Thew and Whitney Jacques entered a committed intimate relationship before the purchase of the Driscoll home. The finding does not identify the date on which the intimate relationship began or the exact date of the purchase. Often, a court encounters difficulty pinpointing a specific date when the intimate relationship began because couples slide into the relationship. Thew does not expressly disclose the date on which he contends the committed intimate relationship began, but his argument implies none existed before the April 2016 marriage. More importantly, he argues that no committed intimate relationship could start before the two cohabitated at the Driscoll residence.

We leave until later in the opinion the question of whether a couple must cohabitate in order to enlist in a committed intimate relationship. Assuming cohabitation is not necessary, we find sufficient evidence to support a finding of a committed intimate relationship months before May 2015. The parties dated no one else between June 2013 and May 2015. The two spoke about marrying and having children, and Whitney Jacques did not wish to bear a child with someone other than a husband. Jacques became pregnant in 2014. Andrew Thew became excited. Although the two maintained separate residences, Thew, according to Jacques, spent every night and nearly all free time at her residence. Thew sought to purchase a home for the family, including children that the two would bear together.

12

Andrew Thew attacks the dissolution court's finding that the parties' committed intimate relationship lasted eight years. This challenge relates to Thew's contention that a committed intimate relationship could not commence until cohabitation. We agree that, assuming cohabitation is an essential element to such a relationship, the committed intimate relationship lasted only six to seven years. If cohabitation is not necessary, the committed intimate relationship lasted as long as eight years. We do not consider the difference between six and eight years significant in our later analysis.

Andrew Thew next challenges the finding that the parties intended a long-term marital and family relationship that included raising children together. Overwhelming, if not undisputed testimony, supports this finding. Even before May 2015, the parties discussed marriage and child rearing. Whitney Jacques became pregnant in 2014. Thew purchased a home with a color scheme to please Jacques' oldest daughter.

Andrew Thew complains that the evidence does not support a finding that the couple shared expenses and pooled resources with Thew paying the mortgage and Whitney Jacques paying food, utilities, and child expenses. We agree that the evidence supports no such finding if the trial court intended for the finding to extend to time before occupying the Driscoll home. The undisputed evidence, including Thew's testimony, however, showed the parties agreed to share expenses after dwelling in the Driscoll residence.

13

Andrew Thew next assigns error to the finding that the parties intended a lengthy relationship that included love, companionship, support, and building a family even before the marriage. For reasons already expressed, substantial evidence supported this finding.

Finally, Andrew Thew challenges the finding that he purchased the Driscoll home during a committed intimate relationship. We reserve discussion on this finding.

Committed Intimate Relationship

To analyze the parties' legal contentions on appeal, we first discuss the adoption of, and principles emanating from, this state's committed intimate relationship rule. Before 2007, the law branded a cohabitating intimate relationship as a "meretricious relationship," a phrase sometimes defined by laypeople as an attractive relationship that lacked integrity. Because of the pejorative nature of the term, the Washington Supreme Court, in 2007, relabeled the relationship with a politically correct term of "committed intimate relationship." *Olver v. Fowler*, 161 Wn.2d 655, 168 P.3d 348 (2007). We generally use the latter nomenclature. We also note that the committed intimate relationship signifies the same relationship considered to be a common law marriage in many other jurisdictions. 52 Am. Jur. 2d *Marriage* § 36 (2024). Common law marriage is not recognized under Washington law. *In re Marriage of Pennington*, 142 Wn.2d 592, 600, 14 P.3d 764 (2000); *Peffley–Warner v. Bowen*, 113 Wn.2d 243, 249, 778 P.2d 1022 (1989). So, we pretend we do not apply common law marriage and utter the phrases

14

"marital-like relationship" or "committed intimate relationship" instead. *In re Marriage of Pennington*, 142 Wn.2d 592, 601 (2000).

Historically, the law presumed property acquired during a meretricious relationship to belong to the person who held title to the property. *Connell v. Francisco*, 127 Wn.2d 339, 347, 898 P.2d 831 (1995). In the absence of any evidence to the contrary, courts presumed as a matter of law that the parties intended to dispose of the property exactly as they acquired it. *Creasman v. Boyle*, 31 Wn.2d 345, 356, 196 P.2d 835 (1948). The Washington Supreme Court labeled the presumption the *Creasman* presumption.

Legal pundits and one Washington Supreme Court justice attacked the *Creasman* presumption as unfair. Justice Finley penned:

> The rule often operates to the great advantage of the cunning and the shrewd, who wind up with possession of the property, or title to it in their names, at the end of a socalled [sic] meretricious relationship. So, although the courts proclaim that they will have nothing to do with such matters, the proclamation in itself establishes, as to the parties involved, an effective and binding rule of law which tends to operate purely by accident or perhaps by reason of the cunning, anticipatory designs of just one of the parties.

*West v. Knowles*, 50 Wn.2d 311, 316, 311 P.2d 689 (1957) (Finley, J., concurring). Although on occasion the presumption might benefit the woman in the relationship, typically the man benefited as seen in most reported decisions.

15

To avoid inequitable results, Washington courts developed a number of exceptions, including an implied partnership, a constructive trust, tracing source of funds, contract theory, tenancy in common, and a constructive trust. *Latham v. Hennessey*, 87 Wn.2d 550, 554 P.2d 1057 (1976); *In re Estate of Thornton*, 81 Wn.2d 72, 499 P.2d 864 (1972); *Humphries v. Riveland*, 67 Wn.2d 376, 407 P.2d 967 (1965); *Shull v. Shepherd*, 63 Wn.2d 503, 506, 387 P.2d 767 (1963); *West v. Knowles*, 50 Wn.2d 311 (1957); *Dahlgren v. Blomeen*, 49 Wn.2d 47, 298 P.2d 479 (1956); *Omer v. Omer*, 11 Wn. App. 386, 523 P.2d 957 (1974); Washington State Bar Association, *Community Property Deskbook* §§ 2.70–2.76 (1989). Presumably, these alternative theories of acquiring an adjudicated ownership interest in property by a boyfriend or girlfriend remain available, but Whitney Jacques does not rely on any of them.

In 1984, the Washington Supreme Court abrogated the *Creasman* presumption in *In re Marriage of Lindsey*, 101 Wn.2d 299, 678 P.2d 328 (1984). In its place, the court adopted a general rule requiring a just and equitable distribution of property following a meretricious relationship. *Connell v. Francisco*, 127 Wn.2d 339, 347 (1995); *In re Marriage of Lindsey*, 101 Wn.2d 299, 304 (1984).

The Washington Supreme Court grounded the rule of meretricious relationship, now committed intimate relationship, on an underlying equitable foundation. *In re Marriage of Pennington*, 142 Wn. 2d 592, 602 (2000); *Muridan v. Redl*, 3 Wn. App. 2d 44, 62 (2018). Courts, when applying factors showing the presence of a committed

16

intimate relationship, should remember that the factors are simply the tools courts use to enhance an understanding of the equities that encompass a committed intimate relationship analysis. *Muridan v. Redl*, 3 Wn. App. 2d 44, 62 (2018). The bottom line is that, when a committed intimate relationship ends, no one party should be unjustly enriched. *Muridan v. Redl*, 3 Wn. App. 2d 44, 62 (2018). The doctrine simply seeks a fair and equitable division of assets at the end of the relationship. *In re Marriage of Pennington*, 142 Wn. 2d 592, 602 (2000); *Muridan v. Redl*, 3 Wn. App. 2d 44, 62 (2018). These sentences suggest that no court should be slavish to any black letter rules behind a committed intimate relationship analysis. This suggestion directs utilize fairness and equity in resolving Andrew Thew's appeal.

Cohabitation

Andrew Thew insists that a couple must be cohabitating at the time of the acquisition of an asset for that asset to be treated as community property under the committed intimate relationship rule. In turn, he emphasizes the dissolution court's finding that he and Whitney Jacques did not cohabitate until they moved into the Driscoll home. One Court of Appeals decision agrees with Thew: *Byerley v. Cail*, 183 Wn. App. 677 (2014). We disagree with the decision and rule otherwise.

In *Byerley v. Cail*, 183 Wn. App. 677 (2014), James Cail contended that uncontroverted evidence at trial established that he purchased the house as his separate property before the inception of the committed intimate relationship. Margaret Byerley

17

testified that she and Cail began cohabitating at the end of September or in October 1996.

Cail, on the other hand, denied at trial that the parties had a committed intimate

relationship at all and contended that he bought the house in July 1996. Cail alone signed

a purchase and sale agreement in July. The seller executed a deed conveying the property

to Cail alone on September 9, 1996, which deed was recorded on September 13.

This court, in *Byerley v. Cail*, reversed the trial court and held that the property

remained the separate property of James Cail. In so holding, this court ruled that a

committed intimate relationship cannot commence before the date the parties began

living together. Cohabitation is a sine qua non of a committed intimate relationship.

When declaring cohabitation to be essential for treatment of an asset under the

committed intimate relationship rule, the Court of Appeals, in *Byerley v. Cail*, relied on a

passage from *Connell v. Francisco*:

> A meretricious relationship is a stable, marital-like relationship
> where both parties *cohabit* with knowledge that a lawful marriage between
> them does not exist.

*Connell v. Francisco*, 127 Wn.2d 339, 346 (1995) (emphasis added). Other decisions

have repeated this description of a committed intimate relationship as including

cohabitation. *Muridan v. Redl*, 3 Wn. App. 2d 44, 55 (2018). Nevertheless, the

Washington Supreme Court, in *Connell v. Francisco*, never expressly held that residing

in separate residences precludes a committed intimate relationship. More importantly,

the Supreme Court cited for its description of the meretricious relationship the decision of

18

*In re Marriage of Lindsey*, 101 Wn.2d 299 (1984), the decision that first recognized one party may gain an interest in property titled in the other party's name despite living together outside of marriage. The Supreme Court, in *In re Marriage of Lindsey*, mentioned nonmarital couples cohabitating, but the court nowhere suggested that cohabitation is needed. The court did not describe a meretricious relationship as a stable, marital-like relationship, during which both parties cohabitate.

The Washington Supreme Court, years after *In re Marriage of Lindsey*, collated a list of five factors mentioned in *Lindsey* that evidence a committed intimate relationship. The list reads: (1) continuity of cohabitation, (2) duration of the relationship, (3) purpose of the relationship, (4) pooling of resources and services for joint projects, and (5) the intent of the parties. *Connell v. Francisco*, 127 Wn.2d 339, 346 (1995). We will later analyze the factors. For now, we note that the five factors are not exclusive. *In re Marriage of Pennington*, 142 Wn.2d 592, 602 (2000). No one factor is determinative or more important than another. *Walsh v. Reynolds*, 183 Wn. App. 830, 845, 335 P.3d 984 (2014); *In re Long and Fregeau*, 158 Wn. App. 919, 926, 244 P.3d 26 (2010). Courts should not apply these factors in a hyper-technical fashion, but must base the determination on the circumstances of each case. *In re Marriage of Pennington*, 142 Wn.2d 592, 602 (2000); *Muridan v. Redl*, 3 Wn. App. 2d 44, 55 (2018). While the criteria assist in determining the existence of committed intimate relationship, the Supreme Court did not adopt them as a rigid set of requirements but directed that courts

19

examine each case on its facts. *In re of Marriage of Lindsey*, 101 Wn.2d 299, 305 (1984).

The first factor is continuity of cohabitation. No decision states that continuity of cohabitation includes occupying the same residence at the time of the acquisition of the subject property. More importantly, since no factor controls the outcome of the case, no length or discrete time of cohabitation should govern. Rigidly conditioning a community-like interest in an asset on cohabitation at the time of acquisition conflicts with the rule that no one factor controls and obstructs the direction of the Supreme Court to perform equity in each case. Such rigid application of the rule fails to recognize that couples do not necessarily enter a committed intimate relationship at a precise moment in a discrete place.

We next note that Andrew Thew provided no testimony as to when he acquired the Driscoll home. He supplied no documents confirming the date of the sale. The trial court entered no finding identifying the date of the acquisition other than noting the purchase occurred in May 2015.

Although Andrew Thew titled the home in his name, Whitney Jacques also paid $1,000 for the down payment. Thew fails to recognize this payment and its implication for Jacques partially owning the home.

The dissolution court deemed Andrew Thew's testimony that he tendered a $4,000 down payment as self-serving and a failure in his burden of proof. Thew presented no document confirming payment for the acquisition of the Driscoll home.

In *Morgan v. Briney*, 200 Wn. App. 380 (2017), the committed intimate relationship began in mid-1994. Nickey Briney purchased the house in his name in November 1995. To rebut the presumption of the house being a community asset, Briney needed to show that he acquired the house with separate funds. The parties agreed that Briney paid the initial $74,000 down payment, but the trial court's findings of fact did not contain any specific information about the source of the funds that Briney used to make that down payment. Briney did not trace the funds he used for the down payment to a specific separate account or show that the funds came from separate income. On appeal, Briney emphasized his testimony that he used his money, Margaret Morgan's admission that he used his money, and statements showing his net worth at the time of acquisition. This court ruled that such testimony did not satisfy Briney's burden of proof. This court noted that the trial court never entered a finding that Briney met his burden with clear and convincing evidence. Therefore, we presumed that the court made a finding against Briney on this issue. We further held that the trial court did not err by characterizing the house as a community asset.

Assuming Andrew Thew secured the Driscoll home before the couple and the daughters inhabited the home, the acquisition would have occurred only days before the

21

move.  No case addresses the situation of when the title to the home is placed in one partner's name and the couple contemporaneously occupied the residence while engaged in an intimate family relationship.  Thew splits hairs too thinly.  The two intended to live together as a family at the Driscoll home and Jacques became pregnant with their child before the move.

Finally, we note that the dissolution court found that the couple first cohabitated when living in the Driscoll home, but also found that the committed intimate relationship began before the parties moved into the residence.  Thus, the trial court deemed cohabitation unessential to its finding of the committed intimate relationship.  The findings do not identify the date when the relationship began, but the trial court must have considered that Andrew Thew spent all of his free time at Whitney Jacques' apartment before the couple switched to the Driscoll home.  For this reason, we question the trial court's finding that cohabitation did not occur until the two occupied the Driscoll residence.

In *Morgan v. Briney*, 200 Wn. App. 380 (2017), the parties disputed when the committed intimate relationship began.  The parties also contested the character of the house as Nickey Briney asserted he purchased the property with his separate financial resources before the commencement of the committed intimate relationship.  Briney contended the committed intimate relationship began after an eight-month hiatus in his and Margaret Morgan's cohabitation, about four years after acquiring the house.  The

trial court determined the committed intimate relationship began when the parties moved into the house together. The Court of Appeals, after noting the existence of a committed intimate relationship is dependent on the facts of each case, actually rolled back the date the committed intimate relationship commenced to an earlier date when the parties first began cohabitating in an apartment.

### *Connell* Factors

We now review the five *Connell* factors that guide us when assessing whether the relationship ripened into a committed intimate relationship. To repeat, those factors are: continuous cohabitation, duration of the relationship, purpose of the relationship, pooling of resources and services for joint projects, and the intent of the parties. *Connell v. Francisco*, 127 Wn.2d 339, 346 (1995). These factors are not exclusive, and no one factor is more important than the others. *In re Marriage of Pennington*, 142 Wn.2d 592, 602 (2000). Courts should not apply these factors in a hyper-technical fashion, but must base the determination on the circumstances of each case. *In re Marriage of Pennington*, 142 Wn.2d 592, 602 (2000); *Muridan v. Redl*, 3 Wn. App. 2d 44, (2018). The weight to be given to each factor has not been established, nor has how to balance one factor against any other factor or factors. *Muridan v. Redl*, 3 Wn. App. 2d 44, 62 (2018). Ultimately, the existence of a committed intimate relationship depends on the facts of each case, and the "factors are meant to reach all relevant evidence" that may be helpful. *In re Marriage of Pennington*, 142 Wn.2d 592, 602 (2000).

23

Continuity of Cohabitation

We journey through the *Connell* factors, beginning with cohabitation. Andrew Thew emphasizes finding of fact 22 that reads in part: "the parties did not cohabitate together until after they moved into the Driscoll home in May 2015." CP at 72. We have already noted that Thew, despite maintaining a different address, stayed every night at Whitney Jacques' apartment for months before May 2015. The parties had already acted as a committed, intimate couple talking about marriage and conceiving a child.

Even assuming Whitney Jacques and Andrew Thew did not cohabitate before the purchase of the Driscoll home, the two immediately cohabitated on its purchase in May 2015. The couple thereafter continuously cohabitated until January 2022. This factor favors a committed intimate relationship.

Duration of Relationship

Andrew Thew argues that the trial court erred in finding that the parties had an eight-and-a-half-year relationship, particularly when the court found they did not cohabitate until May 2015. Even under Thew's reckoning, the relationship lasted six years. This duration suffices for the factor to favor a committed intimate relationship.

While a "long term" relationship is not a threshold requirement, duration is a significant factor. *Connell v. Francisco*, 127 Wn.2d 339, 346 (1995). In *In re Marriage of Lindsey*, 101 Wn.2d 299 (1984), the Supreme Court deemed that a relationship lasting less than two years qualified as a meretricious relationship.

24

In *Muridan v. Redl*, 3 Wn. App. 2d 44 (2018), the trial court found the duration of the relationship of the parties involved to be approximately seven years. This court upheld the trial court's finding because the available record established the parties "were in a dating relationship for about two years before living together as a couple for a total of over six years." *Muridan v. Redl*, 3 Wn. App. 2d 44, 59 (2018).

Intent of the Parties

Andrew Thew argues that substantial evidence fails to support the trial court's finding that the parties intended to engage in a long-term relationship before cohabitating. According to Thew, the dissolution court arrived at this finding based only on decisions the couple made after residing together.

In *Muridan v. Redl*, 3 Wn. App. 2d 44 (2018), the trial court found that the parties intended to live together as a family and enter into a committed intimate relationship. This court upheld the finding because the parties continuously lived together for over six years, executed a domestic partnership affidavit, chose to raise a child together, remained committed to each other when problems arose in their marriage, and actively attempted to have a second child together.

Testimony established that Whitney Jacques and Andrew Thew, before May 2015, discussed building a family together, buying a home, and marrying. The couple excitedly experienced a pregnancy before the purchase of the Driscoll home. Thew spoke about Jacques' daughters from her previous marriage residing in the home. Once the parties

25

moved into the Driscoll dwelling, they shared expenses and lived together continuously for six years. They married on April 7, 2016. During their marriage, the parties bore two children together. This evidence establishes that the parties intended to be in a long-term, committed relationship before and after the purchase of the home.

Pooling of Resources

The dissolution court found that the parties pooled resources, and we earlier found substantial evidence to support the finding. This factor favors the presence of a committed intimate relationship.

Fairness stemming from the parties' pooling of resources particularly demands a ruling in favor of Whitney Jacques. While Andrew Thew used his paycheck to pay the mortgage, Jacques spent her earnings on food, utilities, and child expenses for the entire family. Thew, in essence, wishes his income to solely benefit him, while Jacques' wages benefitted the family as a whole. Thew does not suggest that he will repay Jacques a portion of the money she invested in the well-being of the family that included Thew and his children.

Purpose of Relationship

Andrew Thew does not assert any argument with respect to this factor. Instead, he writes that "The trial court did conclude that the purpose of the relationship was to have companionship, friendship, love, mutual support, caring and building a family," and that "The trial court found that purpose to have 'began back prior to the marriage.'" Br. of

Appellant at 35 (quoting RP 182). Thew states the court found that this factor supported the existence of a committed intimate relationship. We agree. This factor weighs in favor of the existence of a committed intimate relationship at the time of the Driscoll home purchase.

Conclusion

This court reviews a trial court's conclusion that the parties were in a committed intimate relationship de novo. *Muridan v. Redl*, 3 Wn. App. 2d 44, 54 (2018). Whether such relationship existed poses a mixed question of law and fact. We review de novo whether the trial court's legal conclusions properly follow from the findings. *Muridan v. Redl*, 3 Wn. App. 2d 44, 54 (2018).

All five *Connell* factors weigh in favor of concluding that a committed intimate relationship existed between Andrew Thew and Whitney Jacques when the Driscoll home was purchased. We conclude that the dissolution court did not err when finding such a relationship existed for purposes of joint ownership of the Driscoll residence.

Andrew Thew also challenges the dissolution court's characterization of the mortgage debt on the Driscoll home as a community liability. Of course, this ruling benefits Thew assuming the home gained community property status. A debt incurred by either spouse during marriage is presumed to be a community debt. *Oil Heat Co. of Port Angeles v. Sweeney*, 26 Wn. App. 351, 353, 613 P.2d 169 (1980). This presumption generally applies to debt incurred during a committed intimate relationship.

> The test for determining whether a debt obligation is separate or community in nature is the purpose for which the note was executed. If the money is borrowed for a community purpose, then the debt is community. On the other hand, if the money is borrowed for a separate purpose, then the debt is separate.

*In re Marriage of Hurd*, 69 Wn. App. 38, 54-55, 848 P.2d 185 (1993) (citations omitted).

The mortgage on the Driscoll home was acquired during a committed intimate relationship. Therefore, that debt is presumed to be community-like.

Equitable Division of Marital Assets

Declaring the parties to have engaged in a committed intimate relationship and identifying a time when the relationship began are not ends in themselves. These assessments help to determine the nature of an asset for purposes of dividing assets when the relationship ends, whether or not the couple eventually married. Property acquired before an intimate family relationship began is presumed to be separate property, while the law considers property acquired during the relationship to be community property. *Morgan v. Briney*, 200 Wn. App. 380, 390 (2017).

Andrew Thew does not contend that, even if the committed intimate relationship existed at the time of his acquisition of the Driscoll home, the asset should remain his separate property because he solely paid for the house. The party asserting that an asset acquired during the committed intimate relationship is separate property bears the burden of proving it was acquired with separate funds. *Morgan v. Briney*, 200 Wn. App. 380,

28

390 (2017). The party must present clear, cogent, and convincing evidence that the asset falls within a separate property exception. *Burgess v. Crossan*, 189 Wn. App. 97, 103, 358 P.3d 416 (2015). The party cannot meet this burden by mere self-serving declarations that he acquired it from separate funds and a showing that separate funds were available for that purpose. *Berol v. Berol*, 37 Wn.2d 380, 382, 223 P.2d 1055 (1950). The party must be able to trace the funds with particularity. *Berol v. Berol*, 37 Wn.2d 380, 382 (1950); *Morgan v. Briney*, 200 Wn. App. 380, 390 (2017). The name under which property is held does not constitute direct and positive evidence determinative of whether the property is community or separate. *In re Marriage of Skarbek*, 100 Wn. App. 444, 448, 997 P.2d 447 (2000).

Andrew Thew argues the dissolution court abused its discretion in dividing the property and in finding the property division to be just and equitable. To support this contention, Thew only argues that the dissolution court mischaracterized the Driscoll residence and the mortgage as a community asset and community debt.

This court reviews a trial court's property division in a dissolution proceeding for an abuse of discretion. *Byerley v. Cail*, 183 Wn. App. 677, 684-85 (2014). This court applies that same standard "to a trial court's distribution of property following a committed intimate relationship." *Byerley v. Cail*, 183 Wn. App. 677, 685 (2014). A trial court abuses its discretion if its decision is manifestly unreasonable, adopts a position no reasonable judge would take, is based on untenable grounds, or misapplies

29

the law. *Muridan v. Redl*, 3 Wn. App. 2d 44, 54 (2018); *In re Matter of L.H.*, 198 Wn. App. 190, 194, 391 P.3d 490 (2016). We conclude the dissolution court did not abuse its discretion when dividing the couple's assets and liabilities.

### Attorney Fees

Whitney Jacques requests attorney fees on appeal pursuant to RCW 26.09.140. She argues she has the need and Andrew Thew has the ability to pay. Because we affirm Jacques' equalization payment of $102,515 from Thew, we deny the request for fees.

### CONCLUSION

We affirm the dissolution court's division of property. We deny Whitney Jacques an award of reasonable attorney fees and costs on appeal.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_Fearing, J._

Fearing, J.

I CONCUR:                         I CONCUR IN RESULT ONLY:

_Lawrence-Berrey, C.J._            _Pennell, J._

Lawrence-Berrey, C.J.             Pennell, J.

30