IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Committed Intimate Relationship of | No. 86472-6-I |
| BETH GONZALES, | DIVISION ONE |
| Respondent, | UNPUBLISHED OPINION |
| and | |
| ANTHONY SCOTT CAMP, | |
| Appellant. | |

DíAZ, J. — Anthony Scott Camp and Beth Gonzales entered into a committed intimate relationship (CIR) in 2004. Seventeen years later, Gonzales petitioned to dissolve the CIR. Following trial in 2024, the superior court divided the parties' property. Camp now challenges this property division, primarily arguing the court improperly mischaracterized his separate property as community property. We disagree and affirm.

## I. BACKGROUND

Camp and Gonzales met in April 2003 and dated over the following months. In May 2004, Gonzales became pregnant, and the parties and their children from prior relationships started residing together at Gonzales' property in Lake Stevens, Washington, which she purchased prior to the CIR. It is undisputed on appeal that

May 2004 marks the beginning of the CIR.

As will be elaborated upon below, in August 2005, Gonzales sold her Lake Stevens property and received approximately $41,000 in profit. She applied those proceedings to the benefit of the community. Concurrently, the parties and their children moved to Camp's property on 40th Avenue in Stanwood, Washington (40th Avenue property), which Camp had purchased prior to the CIR and which the parties improved over the next 13 years.

In May 2021, Gonzales petitioned the Snohomish County Superior Court for dissolution of the CIR. It is undisputed that May 5, 2021 marks the end of the CIR.

A three-day bench trial concluded in January 2024. Gonzales and Camp served as the only witnesses. In February 2024, the superior court issued the following final division of property:

1. The court awarded Gonzales the 40th Avenue property.

2. The court ordered Camp pay off a $47,000 loan he took out to prevent the foreclosure of the 40th Avenue property.

3. The court awarded Camp a property on Happy Hollow Road in Stanwood, Washington.

4. The court awarded Camp ownership of the Spectrum Services and Spectrum Lab Services.

5. The court evenly split between Gonzales and Camp the value of the following two retirement accounts: a Western Washington U.A. Supplemental Pension Plan and a U.A. National Pension Fund account.

2

Camp now timely appeals.

## II.     ANALYSIS

### A.     Overview of the Division of Property of a CIR

There is "a three-prong analysis for disposing of property when a meretricious relationship[1] terminates." *In re Pennington*, 142 Wn.2d 592, 602, 14 P.3d 764 (2000). "First, the trial court must determine whether a meretricious relationship exists. Second, if such a relationship exists, the trial court evaluates the interest each party has in the property acquired during the relationship. Third, the trial court then makes a just and equitable distribution of such property." *Id.* We need only address the second and third *Pennington* steps below, as Camp concedes a CIR existed.

"[M]arital community property laws do not apply directly to CIR dissolution proceedings." *In re Committed Intimate Relationship of Muridan*, 3 Wn. App. 2d 44, 56 n.4, 413 P.3d 1072 (2018). But, "courts may look to those laws for guidance" and thus "may apply by analogy community property laws to committed intimate relationships." *In re Parentage of G.W.-F.*, 170 Wn. App. 631, 637, 285 P.3d 208 (2012).

As to the second step of the *Pennington* analysis, a "court's characterization of property is a mixed question of law and fact." *In re Marriage of Watanabe*, 199 Wn.2d 342, 348, 506 P.3d 630 (2022). The "characterization of property is reviewed de novo as a question of law." *Id.* at 348-49. "Factual findings . . .

---

[1] A "meretricious relationship" is the former term for CIRs. *Oliver v. Fowler*, 161 Wn.2d 655, 661, 168 P.3d 348 (2007).

supporting the characterization are reviewed for substantial evidence." *Id.* at 348. We "may not disturb findings of fact supported by substantial evidence even if there is conflicting evidence." *Merriman v. Cokeley*, 168 Wn.2d 627, 631, 230 P.3d 162 (2010). Rather, the substantial evidence threshold is "'a quantum of evidence sufficient to persuade a rational fair-minded person the premise is true.'" *In re Custody of A.T.*, 11 Wn. App. 2d 156, 162, 451 P.3d 1132 (2019) (quoting *Sunnyside Valley Irrig. Dist. v. Dickie*, 149 Wn.2d 873, 879-80, 73 P.3d 369 (2003)). "As the trial court is in a better position to evaluate the credibility of witnesses, we do not substitute our judgment for the trial court's." *Id.*

Otherwise as to the third analytic step, "[w]e apply the abuse-of-discretion standard to a trial court's distribution of property following a committed intimate relationship." *In re Marriage of Byerley*, 183 Wn. App. 677, 685, 334 P.3d 108 (2014). A court abuses its discretion "if it bases its decision on untenable grounds or acts for untenable reasons or if the decision is manifestly unreasonable." *Id.* at 685. Unchallenged findings of fact are verities on appeal. *A.T.*, 11 Wn. App. 2d at 163.

We review the five decisions enumerated above in turn.

B.  <u>The 40th Avenue Property</u>

a.  <u>Transmutation</u>

Camp disputes the court's finding that, "[a]lthough the property was originally separate," it was—in Camp's words—transmuted into community property because "it was significantly improved by efforts made on behalf of the community." Camp also disputes the court's conclusion that, "[g]iven the totality

of the real property, business property and personal property awarded to [Camp], the Court finds it is fair and equitable to award this property to [Gonzales] as her sole and separate property."

"[P]resumptions play a significant role in determining the character of property as separate or community property." *In re Estate of Borghi*, 167 Wn.2d 480, 483, 219 P.3d 932 (2009). These "are *true* presumptions, and in the absence of evidence sufficient to rebut an applicable presumption, the court must determine the character of property according to the weight of the presumption." *Id.* at 484.

Among these presumptions is that the "character of property as separate or community property is determined at the date of acquisition." *Id.* "Once the separate character of property is established, a presumption arises that it remained separate property in the absence of sufficient evidence to show an intent to transmute the property from separate to community property." *Id.*

"Significantly, the evidence must show the intent of the spouse owning the separate property to change its character from separate to community property." *Id.* at 484-85. "Where, as here, real property is at issue, an acknowledged writing is *generally* required." *Id.* at 485 (emphasis added). Further, "[l]ater community property contributions to the payment of obligations, *improvements* upon the property, or any subsequent mortgage of the property may in some instances give rise to a community right of reimbursement protected by an equitable lien, but such later actions *do not result in a transmutation* of the property from separate to community property." *Id.* at 491 n.7 (emphasis added).

Camp claims the court abused its discretion by characterizing the 40th

Avenue property as community property by transmutation and distributing it to Gonzales, contrary to the principles our Supreme Court announced in *Borghi*. Camp primarily relies on the lack of a written agreement in claiming Gonzales failed to present sufficient evidence of his intent to transmute the 40th Avenue property. We disagree.

It is true that intent to transmute is often demonstrated through, e.g., a quitclaim deed, other real property transfer, or community property agreement. *Borghi*, 167 Wn.2d at 485. But our Supreme Court clearly has held that such writings are only "generally" required to show the intent to transmute real property. *Id.* The question is whether, under an abuse of discretion standard, there is "evidence sufficient to rebut" such a presumption. *Id.* at 484. Thus, the undisputed lack of a written agreement is not dispositive.

On the totality of facts adduced at trial, we hold that substantial evidence supports the court's factual finding that Camp intended to "change its character from separate to community property." *Id.* at 484-85. That intent is shown by more than the improvements they indisputably made to the property.

Gonzales testified that, after forming the CIR, she and Camp intended to buy a new property separate from the 40th Avenue property or her Lake Stevens property. The parties hired a real estate agent and conducted an initial search, but ultimately decided to move to the 40th Avenue property. Gonzales testified "the *only* reason we went to the 40th Avenue was because of what [Camp] told [her], that he wanted to wait to be married and have a wife be part of that, and what we were looking for, *we* already had" in the 40th Avenue property. (Emphasis added).

6

Gonzales also testified that improvements were necessary to the 40th Avenue property to accommodate their growing family. As went unrebutted at trial, the improvements and remodeling were "something that [Gonzales] wanted" for the 40th Avenue property. Further, Gonzales testified they engaged in "significant improvements to the property from 2004 through 2017 using joint funds," not just an isolated remodel.

Taken together, this testimony provides substantial evidence that, rather than purchasing a third party's property, Camp intended to "change the character" of the 40th Avenue property from a home of his alone to a home for his new and growing family. *Borghi*, 167 Wn.2d at 484-85. The trial court credited Gonzales' testimony that such an understanding existed and we do not substitute our judgment about a witness credibility for the trial court's. *A.T.*, 11 Wn. App. 2d at 162.

Gonzales' testimony that she contributed the proceeds from the sale of her Lake Stevens home bolsters the court's interpretation of the parties' intent. She testified she funded the improvements needed to the 40th Avenue property through the $41,000 from the sale of the Lake Stevens property. In other words, Gonzalez forsook the opportunity to purchase a new property, alone or with Camp, on the understanding that she and Camp "already had" what they "were looking for" in the 40th Avenue property subject to significant improvements. It is not an abuse of discretion to find that, underlying these decisions, was Camp's intent to change his separate property into community property.

Moreover, Camp's argument is also undermined by this court's holding that

property "will retain [its] character *as long as it can be traced or identified*." *In re Marriage of Schwarz*, 192 Wn. App. 180, 189, 368 P.3d 173 (2016); *Watanabe*, 199 Wn.2d at 348. "'Commingling' of separate and community funds may give rise to a presumption that all are community property." *Schwarz*, 192 Wn. App. at 190. "This is not commingling in the ordinary sense, however; it must be hopeless commingling . . . only after the effort at tracing proves impossible." *Id.* at 190.

In *Schwarz*, this court illustrated these principles by describing a case in which "farm income was found to have been commingled where, for much of a 44-year marriage, it was part separate (from the separate character of the farm ground) and part community (from community effort)[.]" *Id.* (citing *In re Estate of Witte*, 21 Wn.2d 112, 128, 150 P.2d 595 (1944)). Further, "'there was never any segregation as between the two items and . . . the entire amount was continuously devoted as a whole to the acquisition of other lands which were treated in the same manner.'" *Id.* (quoting *Estate of Witte*, 21 Wn.2d at 128).

While the 40th Avenue property is one asset, the funds the parties invested in it were hopelessly comingled. Gonzales testified that the many years of improvements were jointly funded. Gonzales also testified she deposited the $41,000 was "absorbed within [their] relationship" for various projects after she deposited it in a joint account. Gonzales also testified the parties still shared expenses, and sometimes paid each other in cash, even after they stopped sharing joint bank accounts. And, Gonzales testified Camp refused to give various requested documents during discovery, making segregating or tracing their maintenance of the 40th Avenue property even more "hopeless." *Schwarz*, 192

Wn. App. at 190.

Thus, we hold there was sufficient evidence to persuade a rational fair-minded person that Camp demonstrated an intent to transmute the 40th Avenue property, and that such an intent was further shown through the comingling of funds for nearly two decades. *Byerley*, 183 Wn. App. at 684-85; *A.T.*, 11 Wn. App. 2d at 162; *Schwarz*, 192 Wn. App. at 190.

In turn, as community property, the court did not abuse its discretion by awarding the 40th Avenue property to Gonzales. *Byerley*, 183 Wn. App. at 684-85; *Pennington*, 142 Wn.2d at 602 (courts "have never divorced the meretricious relationship doctrine from its equitable underpinnings" so "that *one party is not unjustly enriched* at the end of such a relationship.")

b. The $47,000 Loan

The court ordered that Camp "shall be solely responsible for a loan in the amount of $47,000." Camp argues the court abused its discretion in doing so because it "awarded the home to [Gonzales] and should have ordered [her] to assume that debt too as it went with the home." We disagree.

In July 2021, the court provisionally ordered the parties to evenly split the mortgage payments on the 40th Avenue property. In October 2023, the court found Camp in contempt for, in part, failing to pay his portion of the mortgage payments. At trial, Gonzales testified they had received foreclosure notices for the 40th Avenue property in February and September 2023. Camp testified he borrowed $47,000 from a friend to arrest the foreclosure proceedings. Gonzales testified Camp took this loan without her knowledge. She further claimed that

Camp blocked her attempts to contact the bank and denied her access to documents, and that he lied about his own communications with the bank.

In short, substantial evidence supports the conclusion that Camp caused the risk of foreclosure, independently took out this loan, and actively blocked Gonzales from addressing the foreclosure. In turn, we hold that there is substantial evidence for the court's finding that Camp "was extremely intransigent in this case" and "acted in bad faith by . . . failing to protect the 40th [Avenue] residence from going into foreclosure proceedings, obstructing [Gonzales] from paying the bills for items assigned to her by the Court." *Watanabe*, 199 Wn.2d 342.

Camp's two page argument also cites no authorities requiring that a loan taken to preserve the property should remain with the homeowner solely because Gonzales was awarded the property. *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) ("Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.").

Thus, we hold the court did not abuse its discretion by ordering Camp, and Camp alone, to pay the $47,000 loan. *Byerley*, 183 Wn. App. at 684-85.

C.      The Happy Hollow Property

The court awarded the Happy Hollow property to Camp, finding it was his separate property and expressly offsetting its award of the 40th Avenue property to Gonzales against its award of the remaining real property to Camp.

Camp now claims the court abused its discretion by including the Happy Hollow property within its "overall calculation in dividing the assets and debts

10

acquired during the CIR." He argues that, "[b]y including [his] separate property home in its calculation of assets and debts acquired during the CIR, the trial court gave a disproportionate and unfair amount of the total assets rather than only the assets acquired during the CIR."

Camp relies on *Connell v. Francisco*, 127 Wn.2d 339, 350, 898 P.2d 831 (1995), where our Supreme Court held, on the one hand, that "a trial court may not *distribute* property acquired by each party prior to the relationship," as such a characterization "limit[s] the distribution" of such property. Similarly, Camp relies on *Byerley*, 183 Wn. App. at 685, where this court held, on the other hand, that a trial court "may award" or "may distribute" property that would qualify as community property.

Both of these general holdings are inapposite because each addresses the wrongful distribution of improperly characterized property, and the proper distribution of properly characterized property. Here, Camp's claim is not that the court improperly characterized the Happy Hollow property, i.e., the second step in the *Pennington* analysis, but that, once so properly characterized, the court cannot include it in the third step of the analysis: the just and equitable distribution. *Pennington*, 142 Wn.2d at 602. Neither case stands for that proposition. Neither case limits a court's overall discretion in justly and equitably distributing property properly calculated, or otherwise requires courts to ignore the parties' respective financial positions.

On the contrary, our Supreme Court has stressed the importance of ensuring a property division is just and equitable, stating, "[a]t the time of

11

dissolution, all property is brought before the court for a 'just and equitable' distribution." *In re Marriage of Farmer*, 172 Wn.2d 616, 625, 259 P.3d 256 (2011) (quoting RCW 26.09.080). While *Farmer* involved legal marriages, we apply that principle "by analogy" to this CIR. *G.W.-F.*, 170 Wn. App. at 637.

Thus, we hold the court did not abuse its discretion by distributing the Happy Hollow property, which was properly characterized as his separate property. *Byerley*, 183 Wn. App. at 684-85.

D.     The Distribution of the Businesses

The court awarded "both Spectrum Services Inc. and Spectrum Lab Services, LLC, along with all of their business inventory, equipment and supplies, accounts receivables, and any debts of said companies to [Camp] as his sole and separate property."

Camp claims that "[a]lthough the businesses were awarded to [him], the characterization of at least Spectrum Services, Inc. was in error," as the court still included it in its overall calculation of weighing the total property awarded to each party. We disagree.

In so arguing, Camp's two-page argument cites only authorities already discussed above. Again, these authorities discuss the distribution of property after it is properly characterized, and do not discuss or limit the court's final "just and equitable" distribution. *Connell*, 127 Wn.2d at 350; *Byerley*, 183 Wn. App. at 685. Here, again, there is no challenge to the characterization of the property, and thus his claim fails.

Thus, we hold the court did not abuse its discretion by utilizing the value of

12

these two businesses in its final just and equitable distribution. *Byerley*, 183 Wn. App. at 684-85.

E.      Retirement Plans

Camp assigns error to the court's distribution of the two retirement plans. The court ordered both accounts "be split 50-50 between the parties . . . based on the value of the funds in existence in [the] account for the period May 1, 2004 through May 5, 2021." Importantly, the court expressly based its distribution on "Camp's intransigence in refusing to comply with discovery requests and failing to provide Ms. Gonzales and the Court with the requisite records" leading it to "draw[] a negative inference against Scott Camp that the funds are community funds contributed during the CIR." The court also found Camp not credible in that he "denied making such contributions" to the accounts, despite evidence and Gonzales' testimony that Camp "made regular contributions to both of the pensions plans during the existence of the CIR."[2]

Camp argues the court abused its discretion by not "limiting the division of [his] two retirement plans to the funds contributed during the CIR and the appreciation of those funds but rather divided the entire accounts 50/50" when the "accounts were started over ten years before the CIR." We disagree.

It is true that "[r]etirement income is generally considered to be deferred

---

[2] Specifically, Gonzales testified Camp never provided account statements as she requested or as ordered by the court during discovery. Ultimately, the court sanctioned Camp monetarily for his obstinance during discovery. Gonzales also testified that Camp contributed to the accounts during the CIR. Camp also provided conflicting testimony on his contributions. For example, he initially claimed he stopped contributing to the Supplemental Pension in 2021, before altering his estimate to "2000 – end of 2002, 2003."

compensation" and the "portion of retirement income earned during the marriage may be divided as community property." *In re Marriage of Anderson*, 134 Wn. App. 111, 117, 138 P.3d 1118 (2006). However, our Supreme Court has also observed "the purpose of [discovery] sanctions generally are to deter, to punish, to compensate, to educate, and to *ensure that the wrongdoer does not profit from the wrong*." *Burnet v. Spokane Ambulance*, 131 Wn.2d 484, 496, 933 P.2d 1036 (1997) (emphasis added).

Here, because of Camp's intransigence, the court had limited information to work. Specifically, the court had no information before it to determine how much was contributed prior to the CIR and during the CIR, from which it could award only the latter. These findings are supported by substantial evidence. *Watanabe*, 199 Wn.2d at 348.

Even assuming arguendo that the trial court had not drawn an adverse inference, or one without substantial evidence, the trial court may "properly consider a spouse's . . . concealment of assets" when making a property distribution. *In re Marriage of Wallace*, 111 Wn. App. 697, 708, 45 P.3d 1131 (2002). Additionally, even if the split resulted in some unequal share of the retirement accounts, courts are not required to distribute property equally. *In re Marriage of DewBerry*, 115 Wn. App. 351, 366, 62 P.3d 525 (2003). "An equitable division of property does not require mathematical precision, but rather fairness, based upon a consideration of all the circumstances of the marriage, both past and present, and an evaluation of the future needs of parties." *In re Marriage of Crosetto*, 82 Wn. App. 545, 556, 918 P.2d 954 (1996).

Thus, we hold the court did not abuse its discretion in making a negative inference against Camp which he did not overcome, and, thereby, had tenable grounds to divide the retirement accounts evenly. *Byerley*, 183 Wn. App. at 684-85.[3]

### III.    CONCLUSION

We affirm.

Díaz, J.

WE CONCUR:

Chung, J.

Hazelrigg, ACJ

---

[3] Finally, citing *Watanabe*, 199 Wn.2d at 348, Camp argues the court failed to make required factual findings, simply because our Supreme Court there held that "[f]actual findings, including time of acquisition, method of acquisition, and intent of the donor, supporting the characterization are reviewed for substantial evidence." We disagree with that characterization. Our Supreme Court did not require a court to make a certain type of factual findings, only that whatever findings were made were reviewed for substantial evidence.