IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Committed Intimate Relationship of | No. 85755-0-I |
| LEE JORGENSEN, | DIVISION ONE |
| Appellant, | UNPUBLISHED OPINION |
| and | |
| NATALIE SEARS, | |
| Respondent. | |

SMITH, J. — Lee Jorgensen appeals from a trial court decision granting a CR 41(b)(3) motion and dismissing his petition to dissolve an alleged committed intimate relationship with his former romantic partner, Natalie Sears.[1] Jorgensen contends the trial court's decision is not supported by substantial evidence in the record, challenges several trial management decisions, and contends he was deprived of a fair trial because of his status as a pro se litigant and bias. Substantial evidence in the record supports the trial court's findings and Jorgensen's other assertions of error do not provide a basis for reversal.

We affirm.

---

[1] We refer to the respondent by her former surname in accordance with the pleadings below and her briefing in this court.

FACTS

According to testimony presented at trial, Lee Jorgensen and Natalie Sears met around October 2005. Sears was married at the time. Sears owned and operated her own boat detailing company. Jorgensen split his time between his Chelan residence and Seattle, where he was a deckhand aboard a yacht moored at a dock where Sears often worked. Sears was transitioning from doing all the boat detail work herself, to hiring independent contractors so she could focus on other aspects of running the business. Around this time, Sears also converted her business, Deckhand Detailing, from a sole proprietorship to a limited liability company (LLC). Also around the same time, Sears hired Jorgensen to do boat detailing work.

By early 2006, the relationship between Sears and Jorgensen became romantic. In the early part of the relationship, Jorgensen proposed marriage to Sears, who initially accepted, but then retracted. All the while, Sears shared a home with her then spouse, with whom she was still intimate, engaged in marriage counselling, and in December 2006, purchased a cabin in Cle Elum. Toward the end of 2006, Jorgensen was primarily living in Chelan, but would return to Seattle periodically and sometimes stayed at Sears's townhome when her spouse was away. Sears and her spouse petitioned for dissolution in late 2007.

In January 2008, while the divorce was pending, Sears purchased a condominium (condo) in the Queen Anne neighborhood of Seattle with separate funds and a loan co-signed by her then-spouse. Sears's marriage was dissolved

in February 2008 and her former spouse quitclaimed the Queen Anne condo to her. Sears was awarded the Cle Elum cabin, the condo, and her business in the dissolution.

In July 2008, Jorgensen and Sears began living together full time, primarily at Sears's condo. During the time that they lived together, Sears was solely responsible for paying all housing expenses, including mortgages and utilities. The relationship suffered a significant disruption because of Jorgensen's actual or suspected infidelity in 2009, and again in 2014. For a period of time after the 2014 incident, Jorgensen and Sears alternated residences so as not to share the same space. Although they gradually resumed their relationship, for the most part they were no longer intimate after 2014 and all intimacy ended in 2017. Sears and Jorgensen broke up around 2019 and thereafter Jorgensen stayed only at the Cle Elum cabin. By then, Jorgensen was no longer working for Deckhand Detailing. In January 2020, Sears demanded that Jorgensen vacate the cabin.

After they separated, Jorgensen petitioned in superior court seeking to dissolve the parties' committed intimate relationship (CIR). Jorgensen alleged that the condo, Cle Elum cabin, and Deckhand Detailing, were community-like assets that should be equitably divided. Jorgensen also brought a separate claim for back overtime pay against Deckhand Detailing with the Department of Labor and Industries (L&I). L&I determined that the company owed Jorgensen overtime pay, and Sears settled the claim.

Sears sought summary judgment dismissal of Jorgensen's petition. The superior court granted the motion, concluding that, as a matter of law, the relationship was not a CIR. Lee appealed.

In a March 14, 2022 unpublished decision, this court reversed because, construing the evidence submitted by the parties in Jorgensen's favor, reasonable persons could reach different conclusions as to the existence of a CIR. *See In re Jorgensen v. Sears*, No. 82556-9-I, slip op. at 14 (Wash. Ct. App. Mar. 14, 2022) (unpublished), https://www.courts.wa.gov/opinions/pdf/825569. pdf.

In the months leading up to the August 2023 trial on remand, Jorgensen moved to bifurcate the trial and to continue it to allow newly-hired counsel to prepare. The court denied both motions, and Jorgensen's counsel withdrew from the case. Based on the anticipated witnesses and evidence, the trial court allocated three days for trial and 14 total hours of trial time for the examination of witnesses.

During the four-day trial, Jorgensen presented the testimony of nine witnesses, including himself and Sears. During trial, Jorgensen moved for additional time to examine witnesses. The court granted additional trial time, but less than the amount Jorgensen requested. Although the parties designated more than 100 exhibits for trial between them, the trial court admitted only 15 exhibits, all offered by Sears on cross-examination.

At the conclusion of Jorgensen's case, Sears moved for dismissal under CR 41(b)(3), arguing that the evidence Jorgensen presented failed to establish

4

the existence of a CIR, the existence of community-like assets subject to division, or the value of any alleged assets.  Ruling as the trier of fact, the court orally discussed and weighed various factors and concluded that a CIR between the parties did not exist.  Even if such a relationship did exist, the court found that the parties acquired no property during the relationship that was subject to division.  And the court ruled that equitable division was not possible, even if required, because there was no evidence of the value of any property at any specific time that would provide a basis for division.  The court entered a written decision that is consistent with, and incorporates, its oral ruling.  Jorgensen appeals.

ANALYSIS

In a bench trial, when the trial court hears a case as the trier of fact, after the plaintiff rests, the defendant may move for the trial court to dismiss the plaintiff's claim on "the ground that upon the facts and the law the plaintiff has shown no right to relief."  CR 41(b)(3).  The trial court may dismiss the claim as a matter of law or "weigh the evidence and make a factual determination that the plaintiff has failed to come forth with credible evidence of a prima facie case."  *In re Dependency of Schermer*, 161 Wn.2d 927, 939, 169 P.3d 452 (2007).  If the trial court weighs the evidence, it must make findings to support its decision and we review the findings for substantial evidence.  CR 41(b)(3); *Schermer*, 161 Wn.2d at 940.  "Substantial evidence exists if, when viewing the evidence in the light most favorable to the prevailing party, a rational trier of fact could find the fact more likely than not to be true."  *In re Welfare of X.T.*, 174 Wn. App. 733, 737, 300 P.3d 824 (2013).

5

We will not substitute our own judgment for that of the fact finder, so we defer to the trier of fact to resolve conflicting testimony, evaluate the persuasiveness of the evidence, and assess witness credibility. *In re Parentage of G.W.-F.*, 170 Wn. App. 631, 637, 285 P.3d 208 (2012). Unchallenged findings of fact are verities on appeal. *Muridan v. Redl*, 3 Wn. App. 2d 44, 62-63, 413 P.3d 1072 (2018).

Committed Intimate Relationship (CIR)

A CIR is a stable, marital-like relationship where both parties cohabit with knowledge that a lawful marriage between them does not exist. *Connell v. Francisco*, 127 Wn.2d 339, 346, 898 P.2d 831 (1995). The doctrine stems from equitable principles and protects the interests of unmarried parties who acquire property during their relationship by preventing the unjust enrichment of one at the expense of the other when the relationship ends. *Connell*, 127 Wn.2d at 349; *In re Marriage of Pennington*, 142 Wn.2d 592, 602, 14 P.3d 764 (2000). Dividing property at the end of a marital-like relationship entails a three-pronged analysis. *Pennington*, 142 Wn.2d at 602. First, the trial court must establish whether a CIR exists. *Pennington*, 142 Wn.2d at 602. Second, if a CIR exists, the trial court evaluates each party's interest in property acquired during the CIR. *Pennington*, 142 Wn.2d at 602. And third, the court then makes a "just and equitable distribution of such property." *Pennington*, 142 Wn.2d at 602.

Five nonexclusive factors guide a trial court's determination of the existence of a CIR: "continuous cohabitation, duration of the relationship, purpose of the relationship, pooling of resources and services for joint projects,

6

and the intent of the parties." *Connell*, 127 Wn.2d at 346. These factors do not apply in a "hypertechnical" fashion and one factor is not more important than another. *In re Long & Fregeau*, 158 Wn. App. 919, 926, 244 P.3d 26 (2010). We review a trial court's determination that a CIR existed as a mixed question of law and fact. *Pennington*, 142 Wn.2d at 602-03.

Jorgensen challenges the trial court's factual findings as to each of the CIR factors.

a. Continuous Cohabitation

The trial court found that the parties' cohabitation was not continuous. Specifically, the court found that the parties lived together from approximately July 2008 until 2014, then lived separately for a period of time, and resumed cohabitation until 2019 or 2020.

Jorgensen argues that because the evidence showed that the parties spent "many full nights" together between 2006 and mid-2008, their cohabitation began at an earlier point in time. According to Jorgensen, the fact that Sears was legally married did not prevent a finding that she cohabited with him in 2006 or 2007 because the marriage was "defunct" and the Issaquah townhome Sears shared with her spouse was merely a "crash pad" and a place for her to receive mail.[2]

---

[2] Below, Jorgensen took the position that the parties began living together around March 2007 because e-mail exchanges between them became less frequent around this time, suggesting they were in the same place from that point onward. Even assuming evidence was admitted at trial to substantiate this claim, cohabitation was not a necessary inference from decreased e-mail correspondence.

Neither Jorgensen's opinion that Sears's marriage was unsalvageable nor the undisputed fact that Sears and Jorgensen spent a number of nights together before they officially lived together undermines the substantial evidence in the record supporting the finding of that Sears and Jorgensen did not *continuously* cohabitate until mid-2008. Before this date, Sears was living at properties she owned with her then spouse. It was not until after Sears divorced and moved to her condo, that Jorgensen fully vacated his Chelan residence, changed his mailing address, moved his pets, and began cohabiting with Sears full-time. *See Burchfield v. Burchfield*, 5 Wn.2d 359, 361, 105 P.2d 286 (1940) (cohabitation means living together "continuously and publicly, and with some degree of permanency"); *Pennington*, 142 Wn.2d at 603 (sporadic cohabitation while one party remained married did not amount to "stable cohabiting relationship").

b. Duration and Purpose of the Relationship

As to the second and third factors, the trial court found, contrary to Jorgensen's claim on appeal, that the nature of the parties' relationship was "romantic" and the purpose of the relationship was "companionship, love, friendship, sex, mutual support, and caring." However, as to both factors, the court determined the relationship was "interrupted," and a preponderance of the evidence did not establish that it was a "stable marital-like relationship for any specific period of time." The court pointed out that early on, when Sears was still married, the parties' relationship was not exclusive or monogamous. The court found that the relationship became "more committed" when the parties began living together, but there was a significant disruption and "discord" in 2009, and

8

again in 2014, because of "infidelity or perceived infidelity." And the court found that all intimacy between the parties ended by 2017.

c. Pooling of Resources and Services for Joint Projects

Jorgensen challenges the trial court's finding that the evidence demonstrated a "limited pooling of resources and services." The court found that Jorgensen's contributions of labor to Sears's condo and cabin were "not extraordinary" and merely part and parcel of living "where he was not paying rent or mortgage." The court further found that Jorgensen's work for Sears's company was "not part of a romantic or marital-like pooling of resources," because Jorgensen was compensated. And the court noted a lack of evidence that the parties opened or maintained any joint financial accounts.

While Jorgensen claims he was not compensated "on a consistent basis" for labor in support of the "jointly operated" detailing business, the trial court expressly found otherwise. The court stated, "[a] preponderance of the evidence does not show that [Jorgensen] was under-compensated for his work at Deckhand Detailing." Jorgensen points to no evidence, let alone substantial evidence in the record, that contradicts this finding. Likewise, Jorgensen fails to identify the evidence supporting his characterization of the parties' financial assets as "hopelessly comingled."

d. Intent of the Parties

While Jorgensen asserts that the parties' mutual intent was to build and maintain a "permanent, married-like relationship," the trial court found that the intent to have a permanent, committed relationship was neither sustained nor

mutual.  The court found that Jorgensen initially intended an "ongoing" relationship, but his intent was only "partial" or "conflicted" because he was soon distracted by other romantic interests.  The court found that Sears also intended a stable, permanent relationship early on, but she changed her mind and ultimately "questioned their ability to have a long-term relationship."  While Jorgensen points to the testimony of witnesses who perceived the relationship as stable and marriage-like, the trial court observed that this evidence was not determinative, noting that witnesses who were not "privy" to the parties' private interactions and communications would not be fully aware of their intent.

In sum, the court's findings as to the CIR factors are supported by substantial evidence in the record, and those findings, in turn, support its conclusion that the parties' relationship did not constitute a CIR.

Property Characterization and Value

As the trial court recognized, even if it had concluded that a CIR existed, that would not end the analysis.  As explained, a finding that a CIR existed would require the court to proceed to the required second and third steps to determine whether and how to divide property.  *Pennington*, 142 Wn.2d at 602.  For purposes of the second step, property acquired before a CIR began is presumptively separate.  *Morgan v. Briney*, 200 Wn. App. 380, 390, 403 P.3d 86 (2017).

The trial court concluded that Jorgensen's claim for equitable division of property would fail as to the second step because no community-like assets were acquired after July 2008, when the court found that the parties began to

10

cohabitate.  *See Byerley v. Cail*, 183 Wn. App. 677, 689, 334 P.3d 108 (2014) (because a CIR cannot commence before parties reside together, the court erred in treating real property acquired before cohabitation began as subject to equitable division, without evidence that the party "intentionally transmuted [the property's] status from separate to community property").  As discussed, substantial evidence supports the court's finding that Jorgensen and Sears began living together, full time and openly, in July 2008.  The evidence also conclusively established that all three assets Jorgensen sought to equitably divide were acquired before July 2008.  Sears started her business in 1990 and converted it to an LLC in early 2006.  Sears acquired the Cle Elum cabin in 2006 with her former spouse and was awarded the property in the February 2008 dissolution.  Sears acquired the Queen Anne condo in January 2008.

Jorgensen appears to contend that Deckhand Detailing became a joint asset during the relationship because although Sears was the only official member of the LLC, he had an ownership interest by virtue of his "acting and performing" the role of a business partner.  But we are aware of no legal authority that supports Jorgensen's claim of an equitable ownership interest in the business, given that membership in an LLC requires formal admission.  *See* RCW 25.15.116 (LLC membership requirements).  And insofar as Jorgensen claimed an equitable ownership interest based on his efforts that added value to the business or Sears's real property, as the trial court noted, Jorgensen presented no evidence of the value of any asset "at any time," for the court to make such a determination.  And, even if Jorgensen established that Deckhand

Detailing increased in value during a period of time when a CIR existed, proved the amount of the increase, and demonstrated that the increase was attributable to his community-like efforts, the trial court found that Jorgensen failed to show that he was not compensated. *See Marriage of Pearson-Maines*, 70 Wn. App. 860, 869, 855 P.2d 1210 (1993) ("valuation of the community services invested in separate property may be approached by either determining the equivalent of a reasonable wage or by fixing the resulting increase in value.").

In short, even if the trial court erred when it found that a CIR did not exist, Jorgensen's claim for an equitable division of assets would fail on multiple other grounds.

### Motion to Bifurcate

Turning next to Jorgensen's claims regarding trial management decisions, several months before the scheduled trial date, Jorgensen filed a one-page motion to bifurcate the trial. He requested that the trial court address his claim in two separate trials: an initial trial to determine the existence of a CIR and a second trial to address "financial aspects." Sears opposed the motion, pointing out that evidence about the parties' finances would be critical to determining whether the relationship was a CIR and arguing that Jorgensen failed to articulate why bifurcation would result in greater accuracy or efficiency. In reply, Jorgensen asserted that bifurcation would allow the parties to conduct additional discovery after an initial trial with a view to a "financial settlement," and indicated that he saw "no evidence that bifurcation wouldn't help." The trial court denied the motion and later denied reconsideration.

Jorgensen maintains that bifurcation would have been "expeditious," suggests he could have hired "expert witnesses and valuators" to testify at the second trial, and complains that the court denied his motion without explanation.

Bifurcation is generally "disfavored" as it may result in piecemeal litigation, judicial inefficiency, and delays in the ultimate resolution of case. *Brown v. Gen. Motors Corp.*, 67 Wn.2d 278, 282, 407 P.2d 461 (1965); *In re Marriage of Hughes*, 128 Wn. App. 650, 658, 116 P.3d 1042 (2005). While bifurcation is to be applied "cautiously," its application remains in the discretion of the trial court. *Brown*, 67 Wn.2d at 282; *In re Det. of Mines*, 165 Wn. App. 112, 124, 266 P.3d 242 (2011). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds. *Mines*, 165 Wn. App. at 124.

Jorgensen provides no authority suggesting that the trial court was required to enter findings to support its decision on his motion. And there is no apparent reason why a bifurcated trial would have led to a more accurate resolution of the facts or why Jorgensen could not have presented expert testimony in a non-bifurcated trial. The trial court acted well within its discretion in denying the motion because Jorgensen failed to cogently explain the benefit of bifurcation, and because bifurcation is not favored, especially when, as here, some of the same evidence would be relevant to issues adjudicated in the proposed separate trials. *Brown*, 67 Wn.2d at 282 (bifurcation not appropriate when "the evidence bearing upon the respective issues is commingled and overlapping").

## Motion to Continue

On June 20, 2023, approximately seven weeks before the scheduled trial date, Jorgensen's newly-retained counsel sought a 90-day continuance of the trial date. Counsel mentioned Jorgensen's difficulty securing funds to hire counsel, stated that he would be in trial on another matter on the scheduled trial date, and explained that he would need additional time to prepare, supplement discovery, and secure an expert witness.

Sears opposed a continuance. She citied, among other reasons, (1) the case had been pending since April 2020; (2) the trial date had already been continued; (3) Jorgensen could have retained counsel earlier, certainly following the March 2023 payment on his L&I claim; and (4) Jorgensen had ample opportunity to engage in discovery in 2020, when he was represented by counsel, and again in 2022, when the court issued a new case schedule.

Shortly after Jorgensen sought a continuance, the case was reassigned to a different superior court judge, and about two weeks later, on July 12, 2023, the trial court denied the motion. The trial court later declined to reconsider its ruling.

Jorgensen claims the trial court's ruling forced him to proceed without counsel because it failed to allow sufficient time for any new attorney to adequately prepare for trial. Jorgensen further suggests that the short period of time between reassignment and the ruling on the motion suggests that the court failed to sufficiently review the record and apprise itself of the complexity and seriousness of the case.

Here also, we review a trial court's ruling on a continuance motion for an abuse of discretion. *Wood v. Milionis Constr., Inc.*, 198 Wn.2d 105, 133, 492 P.3d 813 (2021). In exercising this discretion, courts should consider "the totality of the circumstances brought to the trial court's attention." *Balandzich v. Demeroto*, 10 Wn. App. 718, 721, 519 P.2d 994 (1974). Relevant considerations include the necessity of a prompt disposition; the needs of the moving party; possible prejudice to the nonmoving party; and history of the litigation, including prior continuances. *Balandzich*, 10 Wn. App. at 720; *see also State v. Downing*, 151 Wn.2d 265, 273, 87 P.3d 1169 (2004) (courts "may consider many factors, including surprise, diligence, redundancy, due process, materiality, and maintenance of orderly procedure").

There were valid reasons to deny a continuance. The case had been pending since 2020, the parties had engaged in discovery in 2020, and opposing counsel was prepared to proceed. *See Willapa Trading Co. v. Muscanto, Inc.*, 45 Wn. App. 779, 786, 727 P.2d 687 (1986) (noting the "prejudicial impact" of a continuance on a party who is prepared and ready for trial and benefit of avoiding delay in litigation). Sears pointed out that she had already expended substantial funds on attorney fees and would be prejudiced by further delay in finality, both "financially and emotionally." *See Martonik v. Durkan*, 23 Wn. App. 47, 51, 596 P.2d 1054 (1979) (no abuse of discretion to deny pro se litigant's motion to continue where "interests of the defendant" weighed against continuance).

Nothing in the record supports an inference that the court failed to review the history of the case or failed to appreciate the nature and complexity. And

15

Jorgensen's claim that the ruling deprived him of the opportunity to be represented by adequately prepared counsel fails to recognize that Jorgensen was aware, as of March 2022, that the matter would proceed to trial. Although Jorgensen now appears to suggest that he was forced to try the case himself without the necessary expertise, he concedes that he only began to take steps to identify and retain counsel as the trial date "approached." Jorgensen had ample time to find an attorney and simply failed to act in a reasonably prompt manner. Although counsel's declaration was clear that he would have to withdraw from the case if the court declined to continue it, withdrawal of a civil litigant's attorney, on its own, is not a compelling reason to continue trial. *See Jankelson v. Cisel*, 3 Wn. App. 139, 141, 473 P.2d 202 (1970) ("if a contrary rule should prevail, all a party desiring a continuance . . . would have to do would be to discharge [their] counsel or induce [them] to file a notice of withdrawal").

In view of all the circumstances, the trial court's decision to deny Jorgensen's motion to continue was not manifestly unreasonable or based on untenable grounds.

Enforcement of Time Limits

While the trial court initially allocated seven hours of trial time to each side, Jorgensen asked, mid-trial, for a minimum of four additional hours to present testimony. At that point, Jorgensen had used approximately five hours of his allotted time. Jorgensen explained that he needed more time, in part, because opposing counsel had used a significant amount of his time cross-examining his witnesses. He also claimed that Sears's examination was taking more time than

expected because she "conveniently" failed to remember many details he sought to elicit.

The trial court granted the motion, in part, and allocated an additional three hours of trial time, to be shared equally. In so ruling, the trial court explained that opposing counsel's cross-examination was deducted from Sears's allotted time, not his. The court further explained that the initial amount of time set for trial was not "arbitrary," but was based on its review of the file and the discussion at pretrial conference.

As this court recently confirmed, where time limits for the examination of witnesses are used "to ensure that trials are conducted fairly and expeditiously," we review the enforcement of those limits for abuse of discretion. *Stocker v. Univ. of Wash.*, 33 Wn. App. 2d 352, 359, 561 P.3d 751 (2024). When reviewing a court decision enforcing time limits at trial, courts may consider, among other factors, whether time was allocated equitably; whether the parties had notice of the limits; whether additional time is allowed based on a suitable offer of proof; and whether there is a reasonable inference from the record that a party's "improvident use of time caused the purported need for additional time." *Stocker,* 33 Wn. App. 2d at 361.

Jorgensen argues that the court's ruling unfairly limited the presentation of his case. But the parties had notice of the time limits and the allocation of time was both equitable and in line with the parties' pretrial estimates. And the court granted additional time here, even though Jorgensen made no specific offer of proof and in spite of the fact that the record reflects Jorgensen's inefficient use of

his trial time contributed to his perceived need for more time. Jorgensen's appellate briefing does not address any of these considerations. More importantly, he fails to identify the evidence he would have been able to present if the court had granted additional time. On this record, Jorgensen fails to establish an abuse of discretion.

Pro Se Litigant and Bias

Jorgensen contends the trial court unfairly held him to the same standard as a licensed attorney. And he suggests that the record reveals the court's preferential treatment of opposing counsel and bias against him.

But the trial court was required to hold Jorgensen, a pro se litigant, to the same standards as an attorney. *See In re Marriage of Wherley*, 34 Wn. App. 344, 349, 661 P.2d 155 (1983) ("[T]he law does not distinguish between one who elects to conduct his or her own legal affairs and one who seeks assistance of counsel—both are subject to the same procedural and substantive laws"). This is an important aspect of judicial impartiality. *Edwards v. Le Duc*, 157 Wn. App. 455, 460-64, 238 P.3d 1187 (2010). At the same time, while under no affirmative obligation to do so, the trial court in this case made reasonable accommodations to facilitate Jorgensen's right to a full and fair hearing, by providing guidance, reminding of him of the legal issues he needed to prove, allowing leeway in his questioning, and allowing him to testify narratively. *See* Code of Judicial Conduct (CJC) 2.2, comment 4 (judges may "mak[e] reasonable accommodations to ensure an unrepresented litigant's right to be heard" without violating the rule of partiality and fairness).

18

To support his allegation of favoritism and bias, Jorgensen asserts that the trial court overruled the majority of his objections to irrelevant and inflammatory questions posed by Sears's counsel, whereas the court "proactively" foreclosed some lines of his questioning and sustained objections to his "valid questions" that would have elicited relevant evidence. Trial judges are presumed to perform their functions regularly and properly without bias or prejudice, and a party claiming otherwise must support the claim with evidence of the judge's actual or potential bias. *In re Estate of Hayes*, 185 Wn. App. 567, 607, 342 P.3d 1161 (2015); *Rich v. Starczewski*, 29 Wn. App. 244, 246, 628 P.2d 831 (1981).

The specific examples in the record Jorgensen cites do not support his claim of bias. For instance, Jorgensen claims the trial court sanctioned opposing counsel's improper and unnecessary questioning about the death of his pets and a homophobic comment about a witness. But the court had no opportunity to address the relevancy or propriety of these questions, since Jorgensen did not object.

Jorgensen identifies no affirmative evidence of actual or potential bias. And our careful review of the record reveals no evidence that the trial judge was biased against Jorgensen. In light of the established rule that pro se litigants must be held to the same standards as attorneys, Jorgensen fails to demonstrate that he was deprived of a fair hearing.

Attorney Fees on Appeal

Finally, Sears requests attorney fees on appeal under RAP 18.9, which provides the court with discretion to order a party to pay fees for filing a frivolous

19

appeal. RAP 18.9(a). "An appeal is frivolous if, considering the entire record, the court is convinced that the appeal presents no debatable issues upon which reasonable minds might differ, and that the appeal is so devoid of merit that there is no possibility of reversal." *Advocs. for Responsible Dev. v. W. Wash. Growth Mgmt. Hr'gs Bd.*, 170 Wn.2d 577, 580, 245 P.3d 764 (2010). "[A]ll doubts as to whether the appeal is frivolous should be resolved in favor of the appellant." *Streater v. White*, 26 Wn. App. 430, 435, 613 P.2d 187 (1980). Applying this high standard, considering the record as a whole, and construing all doubts about frivolousness in favor of Jorgensen, we decline to exercise our discretion to award fees as a sanction.

We affirm.

WE CONCUR: